ERNEST CONRADES ET AL. *vs.* GEORGE E. F.
HELLER ET ALS., EXECUTORS.

*Answer of Witness*: *to exclude—, not reversible error, when evidence is otherwise allowed. Contradiction of witnesses: foundation to be laid. Caveats to wills: trial of issues; will as evidence; testamentary capacity; prayers. Changing of wills: mere intent; insufficient. Witnesses to wills: interest; undue influence.*

The fact that a witness was not permitted to answer certain questions, can not present reversible error, when the same facts were put in evidence by other testimony.          p. 451

Questions intended to lay a foundation to contradict a witness by showing that he had made different statements at other times, should include the time, the place where, and the persons to whom the alleged contradictory statements were made.
                                       p. 451

On the trial of issues as to the valid execution of a will, the instrument itself may be offered in evidence and read to the jury.                              p. 452

At a trial of issues on the caveat to a will, where there was no evidence as to the want of capacity, a prayer instructing the jury that there is no evidence which could fairly be made in any way to show that the testator did not have testamentary capacity according to the standard fixed by law of the State, is correct.                          p. 453

A mere intent to change a will is not sufficient to operate as a change.                               p. 454

If a testator understands the effect of the instrument as a whole, it is not material that he did not understand the meaning of all of its technical terms.                    p. 456

The fact that an attesting witness is also a legatee under the will does not affect his competency, nor does the fact that he is a member of the church to which the testator devised her property.                    pp. 456-457

The mere fact that the bulk of the testator's property is bequeathed to the church to which she and two of the attesting witnesses belonged is no evidence of undue influence.

p. 457

For the proper execution of a will it is sufficient to prove that two or more witnesses signed the will in the presence of the testator, and it need not be subscribed by the testator in the presence of witnesses.                    p. 459

It is not necessary to the valid execution of a will that the testator should *ask* the witnesses to sign; it is sufficient if he, by word, act, sign or conduct, makes it certain that he intends the paper to be his will and desires the witnesses to sign it.

p. 461

A Circuit Court has no authority to enter judgment on a verdict rendered on issues sent it from the Orphans' Court.

p. 462

Where appeals are taken from judgments of a Circuit Court on issues from the Orphans' Court, the Court of Appeals does not enter costs whether the judgment is reversed or affirmed; costs are left to the Orphans' Court.                    p. 462

If a judgment for costs in such a case were entered by the Circuit Court, it would be ground for a reversal, in order that such judgment might be gotten rid of.                    p. 462

*Decided January 17th, 1913.*

Appeal from the Circuit Court for Baltimore County (DUNCAN, J.).

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BURKE, THOMAS, PATTISON and STOCKBRIDGE, JJ.

*Allan C. Gridwood* and *Elmer J. Cook* (with whom was *John H. Dumler* on the brief), for the appellants.

*Daniel R. Randall* and *Robert Moss,* for the appellees.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from what is called a judgment on verdicts on five issues sent from the Orphans' Court of Anne Arundel County to the Circuit Court for that county in reference to the will of Louise Kruger, but we assume it was intended to be from the rulings of the Court at the trial of those issues. The case was tried in the Circuit Court for Baltimore County, to which it had been removed. The issues were as follows:

(1) Was the will of Louise Kruger, late of Anne Arundel County, executed by her according to the laws of the State of Maryland relating to the execution of wills?

(2) Was the will of Louise Kruger executed by said Louise Kruger when she was of sound and disposing mind and capable of executing a valid deed or contract?

(3) At the time of the execution of the will by Louise Kruger, did she know the contents of her will?

(4) Was the execution of the will of Louise Kruger procured by undue influence exercised and practised upon her and constraining her free will and agency in the premises?

(5) Was the will of said Louise Kruger procured by fraud practiced upon her?

At the trial five prayers were offered by the defendants, the executors named in the will, and all of them were granted. They instructed the jury to find for the defendants on the respective issues, and their answers were accordingly "Yes" on the first, second and third issues, and "No" on the fourth and fifth. There were ten bills of exception

on rulings as to the admissibility of evidence and the eleventh included the rulings on the defendants' five prayers.

The caveatees, in order to prove the will, first called a deputy register of wills to produce the will which he said was left at the office on January 2nd, 1912, by the executors. Frederick Seeborn, one of the executors, and also the draftsman of and a witness to the will, was next called. On cross-examination he said he wrote the will Monday afternoon, and it was signed Wednesday. He was asked, "Did you write the attestation clause out of your head, without having anything to copy it from?" and the question was objected to and the objection sustained. He was then asked, "Did you write the attestation clause?" That was objected to and the objection sustained. The latter ruling constitutes the first exception. That question was wholly irrelevant and immaterial. The attestation clause was the usual one found in books of forms, but if an answer to the question could have been of any possible advantage to the caveators they obtained it in the answers to the next two questions, which were as follows: "Q. Did you say in your examination in chief that you wrote the attestation clause to the will? A. I wrote the testimony for the witnesses. Q. What do you mean by that? A. What is written there, what the witnesses signed, I mean this; I wrote that."

The other two witnesses to the will were then called and George Bontz (or Bunce, as his name is signed to the attestation clause) was asked, "Now, as a matter of fact, Mr. Bontz, have you not made statements that this paper was executed before you got there?" That question is included in the second bill of exceptions and was clearly objectionable. If it was intended to lay a foundation to contradict the witness, the time, place and persons to whom the alleged contradictory statements were made should have been included in the question. *B. & O. R. R. Co.* v. *Welch,* 114 Md. 544; 2 *Poe,* sec. 280; *Peterson* v. *State,* 83 Md. 194. That is required in justice to witnesses and there is every reason why the rule should be strictly enforced when

an old man nearly eighty years of age. as this witness was, was being examined. The will was executed over seven years before he was examined and this question would have covered that period. The same witness was then asked, "Have you ever made any statements that at the time this will was drawn Mr. Seeborn or Mr. Schultz was running the affair?" Regardless of other objections, what we have said above is applicable to this question, which is in the third bill of exceptions. The question in the fourth bill of exceptions is in somewhat better form, as it was "Didn't you tell me, Mr. Bontz, that this paper was signed before you got there?" but it does not refer to time, place or any attendant circumstances connected with the statement. The ruling on this question was proper, and it would be well if trial courts enforced the well-known practice on that subject more strictly than they sometimes do. There could be no valid objection to offering the will in evidence and reading it to the jury, as was done, as is shown by the fifth bill of exceptions. The caveatees, as is the practice, had called the subscribing witnesses and had made out what was at least a *prima facie* case as to the execution of the will, before offering it. The caveators were then to proceed with their testimony, and unless the jurors had the will before them some of the testimony likely to be offered might have been meaningless and some of it could not have been properly applied. The testimony offered in the sixth bill of exceptions was clearly inadmissible. The caveators read a clause from the will to Mrs. Zopf, who was on the stand in behalf of herself and the other caveators, and she was asked, "What does that mean, do you know?" The Court properly sustained the objection to it. The seventh was equally objectionable. The Court declined to admit a certified copy of a mortgage given by a sister-in-law of Mr. Seeborn to Mrs. Kruger dated the 29th of April, 1905. What relevancy that could have to the case we confess our inability to see—especially as Mr. Seeborn had in effect testified, when called as a witness by the caveators, that he did not know anything

about the mortgage. As the brief of the appellants. made no reference to the eighth, ninth and tenth exceptions, we assume they are not pressed, but at any rate the rulings in them were correct.

This brings us to the rulings on the prayers. We will consider the second, third, fourth and fifth before the first. The second is applicable to the second issue—the testamentary capacity of the testatrix. It instructed the jury to find for the defendants, and to answer "Yes". There was no evidence which can be fairly said to have in any way tended to show that she did not have such testamentary capacity as is required by the standard fixed by the law of this State and it is unnecessary to discuss the subject.

The third prayer instructed the jury that by the uncontradicted evidence in the case, the contents of the paper writing of January 18th, 1905, "were read to her and known to her at the time of the execution thereof and that therefore their verdict must be for the defendants on the third issue and their answer thereto 'Yes'." It seems to us that this prayer was likewise properly granted. We will refer to the only evidence in the case that could be said to suggest that the testatrix might not have known the contents of her will. A nephew, August E. Michaels, said that on the 8th of October, 1911, his aunt "told me for us boys to come down as soon as possible, that she had a watch she wanted to give me, so she would know where it went to," and when asked whether she said anything else, he replied, "Yes, sir; she said, never mind, you boys and the rest of you will be looked after in my will." But that was just a little over two months before her death and nearly seven years after the will was executed. The issue was not whether she *then* understood the contents of her will, but whether she did so *at the time of the execution of the will*. She did in fact by her will leave to Henry Michaels, a brother of that witness, and in case he did not survive her to Charles Michaels, another brother, the sum of $300.00. The witness did not go to Annapolis before his aunt's death, and he never got the watch. It may be that

she wanted to give August the watch because she had made some provision for his brothers, or she may have intended to change her will, but was paralyzed, which resulted in her death a few days after she was stricken. At any rate she did not change her will and, of course, even if she actually intended to do so such intention could not affect the one she had executed. Another witness, Mrs. Mary Hilbert, a sister of the testatrix, said that about ten years ago the testatrix went to California and on her return said "She had a very good time while she was there, they were so kind and good to her, that this nephew at her death would be remembered, that she would remember him in her will, so the same to me and my family." That nephew was George Conrades of California. That was three years before she made her will, and during that time she may have had various reasons for changing her mind, but there is not a particle of evidence in the record to show that she supposed she had made a will in accordance with that statement. If she had thought she had made a will by which she left her estate to her relatives, she would likely have told some of them that she had done so. It would be exceedingly dangerous to permit a jury to set aside a will on the ground that the testator did not know its contents on such testimony as the above if that stood alone.

But it is said that there was testimony to show that the testatrix could not read English in writing, although it was also shown that she did read newspapers printed in English and did speak that language, but not as well as she did German. That might of course affect her knowledge of the contents of the will if she depended alone upon reading it herself, but the testimony of Mr. Seeborn is positive and uncontradicted. He not only swore that he read the will over to her after it was written, but that she directed him as to each clause. He said he wrote the introductory part of the will and read that to her. She said that was all right, and then gave him the parties mentioned in the will. He then wrote and read to her the clause about the real estate and

asked her if it was right, and she said it was; that when she gave him the name of Michaels he did not know how it was spelled and she spelled it for him.   His testimony is then as follows: "Q. Go ahead?   A. Well, when we came down as far as the church, I wasn't through with the testament yet, and she said the rest should go to the German Lutheran Church.   I said, wait a moment, I am not through with this.   I read it over from the beginning, and then asked her about the rest, if there was any particular sum she wanted to fix, and she said I don't want to put any certain sums there, she told me that in German, she said if she should live very long, and then have a funeral and her grave fixed nice that there wouldn't be much left, and she directed me to write it that way.   Q. Did you read it to her?   A. Yes, sir; after I was through I read it to her and said Mrs. Kruger, is that all, and she told me that was all, and left it there"—meaning that he left the will at her house.

This witness was called by the plaintiffs, and was their witness, although he was, it is true, one of the defendants. Their counsel read the portion of the will authorizing the sale of the real estate and asked him if he explained that to Mrs. Kruger before she signed the will, and he said he did. It is claimed, however, that he so contradicted himself that the jury should have been permitted to pass on his evidence, but outside of some statements which were apparently the result of his not understanding the questions, or his inability to express himself as clearly as a better educated person might have done, his evidence is remarkably clear and was apparently free from bias.   He said in some places that she "dictated" the clauses being spoken of, but he very frankly corrected that and said, "she directed me, I should have said."   He left the will with her from Monday until Wednesday, and even if she could not read it in English (although he said she told him to write it so she could understand it), she had every opportunity to consult some of her German or other friends.   He had not written the attesta-

tion clause when he left the will with her, and on Wednesday morning she asked him if he was ready to finish " the testament," as he called it, and he told her he would come to her house at one o'clock. He said he asked her before he went for the witnesses, "if that was all she had to say in it, if it was right and she said that was all, you write it up for the witnesses, then I wrote for the witnesses that day"—referring to the attestation clause.

The scrivener used a book of forms and it is possible that some expressions in the will taken from that book might not have been understood by the testatrix or by the scrivener. But there is nothing which could have misled her as to the disposition of her estate. In speaking of the knowledge of a testatrix of the contents of her will in question CHIEF JUDGE BARTOL said in *Munnikhuysen* v. *Magraw,* 35 Md. 280: "If she knew and understood what the actual contents of the will were, that would be sufficient, although in point of fact she may have had some erroneous opinions with regard to their legal effect and operation." That is repeated in 40 *Cyc.* 1100, referring to that case, and the author adds, "and if he understands the effect of the instrument as a whole it is not material that he did not understand the meaning of all the technical terms used therein." If that were not so, many wills would be invalid on this ground—especially those involving intricate trusts, which often times dispose of large estates in terms which give judges and attorneys trouble in determining their meaning and legal effect.

It was also urged that Mr. Seeborn was an interested party. There can be no doubt that he was a competent witness to the will, as the case of *Leitch* v. *Leitch,* 114 Md. 336, and others in this State settle that question, and to contend that because he was a member, although not even an officer of the church to which she left the residue of her estate (it being the church of which she was also a member) his evidence, which is not contradicted, must be treated as questionable, is placing a low estimate on human testimony. It is not easy to understand how a man could be so much

interested in a church that he would not only perpetrate a fraud on an old woman, but would perjure himself for its benefit. Such a man is not likely to have much real interest in a church, and would have been more likely to have taken care of himself if she did not understand the contents of the will. So far as his commissions are concerned, it matters not who will receive the estate—the fact that the church was the residuary legatee certainly could not have increased his commissions, and possibly, if he had much interest in it, that might have caused him to accept lower commissions than he could have been allowed. We are of the opinion that that prayer was properly granted.

The fourth applies to the issue as to undue influence. There was no evidence offered to show undue influence. Surely there can be no presumption of it because she left the bulk of her estate to the church she and two of the witnesses belonged to. Her estate was probably smaller when her will was written than it was when she died, as one of the caveators said her husband lost everything he had and the testatrix and her husband borrowed $200.00 from her and he started in the oyster business. She said that was ten years ago although she may have been mistaken about that as there was other evidence to the effect that he had been dead for twelve years, but it was probably not a great many years before the will was made. However that may be, the testimony of Mr. Seeborn quoted above shows that she said, if she lived very long there would not be much left. If she was as thrifty as many of her nationality are she probably accumulated more than she expected to, but if she left a larger estate than she contemplated, that fact could not affect her will. She could if she had seen proper have changed it and possibly intended to do so. Some of the testimony we have referred to above reflects on this issue, but we will not further discuss it, as it is not sufficient to prove undue influence. There was no evidence to show fraud and hence the fifth prayer was properly granted.

It only remains to consider the first. The reason given in it was undoubtedly an erroneous statement of the law— "that by the uncontradicted evidence in this case, the paper writing dated the 18th day of January, 1905, purporting to be the last will and testament of Louise Kruger, deceased, and signed by the said Louise Kruger and by two or more competent witnesses, and that therefore their verdict on the first issue must be for the defendants, and their answer thereto 'Yes'." Sec. 323 of Art. 93, Code of 1912, provides that all devises and bequests "shall be in writing and signed by the party devising or bequeathing the same, or by some other person for him, in his presence and by his express direction, and shall be attested and subscribed in the presence of the said devisor by two or more creditable witnesses, or else they shall be utterly void and of none affect." A comparison of the prayer with the statute will show that it does not meet the requirements of the statute. It is undoubtedly not sufficient to prove that two or more competent witnesses signed the will, but it must have been attested and subscribed in the presence of the testatrix by two or more credible witnesses.

It is, to say the least, very doubtful whether this issue submits the question of the attestation of the witnesses at all. It reads, "Was the will of Louise Kruger, late of Anne Arundel county, executed by her according to the laws of the State of Maryland, relating to the execution of wills?" The expression "executed by her" would have to be given a very broad meaning to include what was done by the witnesses. In *Stirling* v. *Stirling,* 64 Md. 138, the first issue was: "Was the paper writing * * * executed by her, or by some person in her presence, and by her express direction in the presence of three or four credible witnesses as and for her last will and testament?" The plaintiffs filed a special exception to a prayer of the defendant in reference to that issue, because it did not require the jury to find that the subscribing witnesses signed their names as witnesses to the will of the testatrix either at her request,

express or implied, or with her knowledge. The Court through JUDGE STONE said: "But no such question can be properly raised under the first issue in this case. If the plaintiffs desired to present that point, they should have done so by an appropriate issue. Such a question could have been, perhaps, properly raised under an issue like the first issue in *Brewer and McColgan* v. *Barrett et al.,* 58 Md. 587." The Court held that the issue was an immaterial one because the law did not require the testatrix to sign in the presence of witnesses and went on to say "Without deciding the question so raised by the special exception, it is sufficient for us to say that before a reversal the Court must be satisfied that there was error in the instruction and that the plaintiffs were thereby injured. As we consider the issue itself an immaterial one, and as the question sought to be raised by the plaintiffs can not be properly raised under such an issue as the first, we must affirm the rulings." The issue referred to in 58 Md. 587, submitted the question of the testator signing the will and also whether it was "attested and subscribed in his presence by three or four credible witnesses," that being the number then required. Under that decision it may well be questioned whether the attestation of the witnesses to this will can properly be considered under this issue.

But assuming it can be, there can be no difficulty about the proof as to the witnesses. Mr. Seeborn testified that he, Mr. Bontz, Mr. Schultz and Mrs. Kruger were all present when the will was executed—when Mrs. Kruger and the witnesses signed it—and that she requested him to sign it. Mr. Schultz testified that the night before the will was executed Mrs. Kruger asked him as an old friend to sign her will and told him to be at her house the next morning about 12 or 1 o'clock. He said Mrs. Kruger and Mr. Seeborn were there when he went but he was not sure about Mr. Bontz; that he saw her sign the will and he saw Mr. Seeborn sign it and they were all together when it was executed. He said as it was so long ago he did not remember whether Mr.

Bontz was there. On cross-examination he was told to "Look at this paper and see what part was read to you, and read it to the jury," and replied "After Mrs. Kruger signed this paper, Mr. Seeborn read this to me—'Signed, sealed, published and declared by the above named testator as and for her last will and testament in the presence of us, who, at her request, in her presence, and the presence of each other, have hereunto subscribed our names as witnesses'—when Mr. Seeborn read that to *you* and wrote it down we signed our names under it."

Some comment was made that Mr. Schultz said in answer to the question, "What statements did Mrs. Kruger make to you at the time you signed the paper," and replied, "No statement at all," but he was manifestly referring to statements as to the contents of the will, as he had previously said in answer to the question "Did she tell you what it was," "No, sir; she asked me to sign her will; I didn't know what was in it or nothing." Mr. Bontz said one of his neighbors called on him to sign the will and Mrs. Kruger, Mr. Schutlz, Mr. Seeborn and he were present. He was asked, "Did Mrs. Kruger state what the paper was that you were signing?" and replied, "I am not sure whether Mrs. Kruger stated it or Mr. Seeborn did, but I understood it was her will; that is all I know about the paper." Again he was asked, "Did you see Mrs. Kruger sign the will?" and replied, "I am not positive of that, but we four were all there together when the paper was signed; I can't remember much about six or seven years ago." Again he said, "There was some signing after I got there; I won't be positive who signed first; I believe I was the second one that signed it; I believe Mr. Seeborn signed after me." That witness was nearly eighty years old when he testified.

There can be no possible doubt that there was a compliance with the requirements of the statute as interpreted by our decisions. No evidence was offered by the caveators to contradict the witnesses to the will, and it can not be doubted that all three of them did actually sign the attesta-

tion clause in the presence of the testatrix and at her request. George Bunce (as it is there written) signed it before Mr. Seeborn, and although Mr. Schautz could not recall whether Mr. Bontz was present, the evidence of Mr. Seeborn and Mr. Bontz is positive on that question. It is not to be expected that laymen such as these would remember all the details for seven years or more, but the attestation clause itself, which Mr. Schultz said was read must be given some effect. It is said in 40 *Cyc.* 1125, that it is *prima facie* evidence of the facts therein recited. Indeed if that were not so how could a will ever be properly probated when the witnesses are all dead or absent? By sec. 353 of Art. 93 proof of the signatures of the testator or of deceased or absent witnesses is allowed and "shall have the same effect upon the probate of said will as if said deceased or absent witnesses had been present at said probate and had testified that said will was duly executed." Lawyers who are called upon to witness wills sometimes have to rely on the attestation clause to remind them of what actually took place, and although that clause is not essential it is always desirable to have it written out in full. In this case there were three witnesses, while the law only requires two, and if there was any question about one the other two would have been sufficient. But without doing more than citing them such cases as *Welty* v. *Welty,* 8 Md. 15; *Etchison* v. *Etchison,* 53 Md. 357; *Moale* v. *Cutting,* 59 Md. 510, and *Cross* v. *Burneston,* 91 Md. 383, show that there can be no question in this case about the execution of the will being in accordance with the laws of this State. It is not necessary that a testator *ask* the witnesses to sign, *Gross* v. *Burneston, supra,* and as to whether he requested the witnesses to sign his will, or sufficiently declared it to be his will, it is sufficient if he by word, act, sign or conduct, makes it certain that he intends the paper which he is about to sign to be his will and desires the witnesses to sign it as such, 40 *Cyc.* 1115-1117.

Such being our conclusions, we will not reverse the case for the error in the first prayer, as in our judgment the jury

was properly instructed to find for the defendants and to answer "Yes," although the reason given was not sufficient. It would be a mockery of justice to reverse on that ground, when all the evidence that could be procured has been produced and we are satisfied from it that the law was complied with.

The docket entries in the record contain this entry: "July 7, 1912. Judgment on verdict for defendants," and the appeal is in terms from the judgment for the defendants. The docket entries do not show that there was a judgment for costs, and the entry was probably not made by direction of the Court. The Circuit Court has no authority to enter judgment on a verdict rendered on issues sent from the Orphans' Court, *Hubbard* v. *Barcus,* 38 Md. 166. No point was made of this by the attorneys, and we have treated the appeal as if it was from the rulings of the Court. "The established practice in such cases is to certify to the Orphans' Court, the verdict of the jury, and the costs, leaving for that Court to enter the proper judgment." *Browne* v. *Browne,* 22 Md. 103. In that case there was a reversal, but there was a judgment for costs. As it does not appear that there was a judgment for costs in this case and as we assume that the entry was an error of the clerk, we will not reverse the judgment, but will affirm the rulings. The entry of judgment should be stricken out, and if there was in fact a judgment for costs entered by direction of the Court, in order that it may be gotten rid of we will entertain an application by appellants to reverse the judgment. We pursue this course for the reason, in addition to those given above, that we do not enter judgments for costs in cases of this kind, whether we reverse or affirm, but leave them to the Orphans' Court.

*Rulings affirmed.*