GRANT *v.* CURTIN ET AL.

[No. 63, October Term, 1949.]

364

*Decided February 8, 1950.*

The cause was argued before MARBURY, C. J., DELA-
PLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*Linwood L. Clark* and *C. M. Weidemeyer*, for appellant.

*O. Bowie Duckett* and *John G. Rouse, Jr.*, for appellees.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from rulings, on motion for "judg-
ment" *n. o. v.*, setting aside the verdicts and answers,
and directing opposite verdicts and answers, on issues
of mental incapacity, knowledge of contents of a will
and undue influence sent from the Orphans' Court after
a caveat to the will of Mrs. Mary Grant Griffin. The
testatrix died August 1, 1948, leaving a will dated No-
vember 5, 1943. Caveatrix filed notice of objections to
probate and of caveat on August 6, 1948, and later filed
a caveat. On November 4, 1948 issues were ordered
sent to the circuit court to be tried by a jury. On Jan-
uary 12, 1949 a motion of caveatees for directed verdicts
was granted on two issues, and rulings were reserved
on the other three, on which the jury found for caveatrix.
A motion for "judgment" *n. o. v.* or, in the alternative,
for a new trial, was filed January 14, 1949. The court
on April 28, 1949 granted the motion *n. o. v.*, set aside
the three verdicts and answers and directed opposite
verdicts and answers, and overruled the motion for a
new trial. On June 3, 1949 caveatrix appealed.

Caveatees have moved to dismiss the appeal because
it was not taken within thirty days. Rule 2 of the Rules
and Regulations Respecting Appeals, as revised, effec-
tive January 30, 1945 and ever since, provides, "All
appeals * * * allowed from any judgment or determina-
tion of a Court of Law, to the Court of Appeals * * *
shall be taken within *thirty days* from the date of such
judgment or determination, and not afterwards; and the
transcript of the record shall be transmitted to the Court
of Appeals within *sixty days* from the time of the appeal
taken * *." [Italics supplied.] In the revision of Jan-

uary 30, 1945 the only change made in Rule 2 was the change in the periods specified from "two months" and "three months" to "thirty days" and "sixty days" respectively. Before January 30, 1945 Rule 2, as such, had been in force at least since 1909, (see also 134 Md. 3, 1920) and, as Art. 5, sec. 6 of the Code, without change in wording since 1888 until 1924.

The words of Rule 2, standing alone, unquestionably were and are broad enough to include appeals from "determinations" at a trial of issues sent from the Orphans' Court. *Kamps v. Alexander,* 133 Md. 198, 104 A. 427; *Bradley v. Bradley,* 123 Md. 506, 91 A. 685. But since 1922 the words of Rule 2 have not stood alone. Because on a verdict on such an issue there is not technically any "judgment" entered in the court of law, this court in the cases cited held that the period of· "two months" ran from the date of verdict, even though a motion for new trial was pending more than two months. To prevent loss of the right of appeal in such cases, Chapter 356 of the Acts of 1922 provided that "All appeals from any decision or determinations or rulings of a court of law in cases of issues sent from the Orphans' Court to a court of law to be tried, to the Court of Appeals * * *, shall be taken within two months from the date the verdict is rendered, unless a motion for a new trial is duly filed, in which case the appeal shall be taken within two months from the date upon which such motion for a new trial is denied, overruled or dismissed; * *". *Bastable v. Bastable,* 144 Md. 213, 214, 124 A. 866. Without mentioning Rule 2, as such, the Act of 1922 amended section 6 so as to except appeals "from decisions and determinations or rulings in cases of issues sent from the Orphans' Court to a court of law to be tried", and added, as section 6A, the above quoted provision for such cases. In the Code of 1924 sections 6 and 6A, as enacted in 1922, were codified as sections 6 and 7. Rule 2, as such, was never changed by this court but was readopted without change in 1933. In the Code of 1939 section 6 was codified in the form of Rule 2,

without the exception made by the Act of 1922, but section 7 was recodified without change. It may be that there is no reason why the periods of two months and three months should be retained in cases of trial of issues from the Orphans' Court, but there is also no reason for obliterating the provision in the act for computing the periods from disposition of a motion for new trial. This court has changed Rule 2 in one respect only, and has not superseded, in whole or in part, the Act of 1922. The act remains in force. The motion to dismiss is over-ruled.

Caveatrix contends that, under the General Rules of Practice and Procedure, Part Two, subd. VI, "Revisory Power of Courts over Judgments, Orders and Decrees", Rule 1, the trial court on April 28, 1949 had no power to grant the motion for judgment *n. o. v.*, after expiration of the term of court (and the "period of thirty (30) days" under the rule) after the motion was filed. The rule mentioned has no application to a motion for judgment *n. o. v.*, which is authorized by Part Three, subd. III "Trials", Rule 8, which in turn is applicable to verdicts on issues from the Orphans' Court. In Rule 8 the word "judgment" is not used in a technical sense, but includes "decisions" or "determinations" on such issues. *Schmeizl v. Schmeizl*, 184 Md. 584, 597-599, 42 A. 2d 106. Moreover, neither of the rules mentioned imposes a time limit on action by the court on motions timely filed.

On the merits the question is whether there is evidence legally sufficient to show mental incapacity or undue influence. On this question, of course, any conflict in evidence for the opposite parties must be resolved in favor of caveatrix. Caveatrix, Kate, is the sister, the only surviving relative, of the testatrix, Mary. Both were born in Ireland, Kate in 1870, Mary (Kate says) fifteen years or more earlier. Kate came to this country when she was eighteen or twenty, Mary earlier. Each spent most of her life in this country as a domestic servant. In 1901 Mary entered the employ of Mrs. May H. Curtin

in Philadelphia, as a nurse, when Mrs. Curtin was eighteen and her daughter (now Mrs. Mae Cochran) was a young baby. Mrs. Curtin's husband was a naval officer. In 1906, while they were living at the Naval Academy, their son Roland (now a Captain in the Navy) was born. Mrs. Curtin and Roland are the caveatees. Mary nursed Roland from his birth. In 1914 Mrs. Curtin's husband died. She and her children, and Mary with them, continued to live in Annapolis. Mrs. Curtin obtained employment, rented a house, 204 King George Street, and left Mary to run the house and take care of the children. In 1919 the daughter married a Naval Academy graduate. In 1920 the daughter (Mrs. Cochran) went to Connecticut, and her mother, with Mary, went there and stayed with her till her oldest child was born. Mary was with Mrs. Curtin continuously from 1901 till she went to Mrs. Cochran in 1920. She was with Mrs. Cochran, and took care of all Mrs. Cochran's three children, till 1927, when she married John Griffin, who owned the house that Mrs. Curtin had rented for some years after Mrs. Curtin's husband's death. Mary was married from Mrs. Cochran's house in Philadelphia. At the wedding, at the Roman Catholic Church in Ardmore, Pennsylvania, at Mary's request, Mrs. Curtin gave her away. Kate, who was then employed in Philadelphia, was at the wedding. Kate says, "I was bridesmaid. I gave her away. I was on the altar when she was married."—an obviously impossible combination of roles. Mrs. Cochran "imagines" Mary was ten years younger than Kate says she was.

During Mary's married life, Kate "came down from [Philadelphia] on weekends, maybe twice a year", and at Christmas, to visit. She says, "When I came to Mr. Griffin's funeral, my sister asked me after the burial was over if I would come and stay with her. She was very lonely and not feeling well and she asked me to come and live with her and I agreed to come and stay with my sister Mary". She did not come of her own accord; Mary asked her. "She always wanted me." She

says [January, 1949] she has lived at 204 King George Street "six years, I think. I came here right after Mr. Griffin died. I think in January he died." She had previously lived in Philadelphia, doing laundry and different things. At that time, Kate says, Mary "was not able to get around very well. She went out a couple of times, but only a few times she went out. Once or twice to church. I was with her and she went to get some coal, and that was all. We went in a taxi and afterwards I did all the marketing for her and paid the bills." She did the marketing because "my sister was not able to go out on the street. * * * She did not have very good eyesight. Only one eye and very limited in the other. * * * If she bought what she wanted, she would leave it behind and forget it, as she did many times. Just forget it. * * * Her memory was very bad. * * * She did not go out very often. Anything in the house, she could not remember where she put it. She would put things away, and she could not remember where she put anything. * * * She did a little work around, not very much. A little bit of something she could do in the house. * * * She was not [able at all to take care of business on the outside]. I did everything for her." There was not at any time any ill-feeling between Kate and Mary. "Never a word. I loved my sister." Kate was at the Emergency Hospital "over two years ago and in the hospital for two weeks." "Just my sister" visited her there. "She took a taxicab. I told her to come that way. She got a taxi to take her there and to go home, and he would always see that she got in the house straight". "We had a little treat myself and Mary, at times, but I never was drunk." Kate never got "really drunk. Very often I drink".

Kate met Mrs. Curtin in Philadelphia when Mrs. Cochran was a little baby. Mrs. Curtin very often visited at 204 King George Street. Mary was a servant for the Curtins for a good many years. "She [Mrs. Curtin] ordered her [Mary] around and she did things for her when she was living there, or anything she wanted she did for her." Mary "treated her [Mrs.

Curtin] nice. I think they had fusses about different things at different times." Kate knows Roland Curtin; she "saw him in her [Mary's] house a couple of times. They were looking for an apartment to live in with his wife. Mary gave him his lunch". She never saw him acting unfriendly or trying to boss Mary. He was "just sitting and talking with her." He did not seem "over" friendly. "Not over zealous". "My sister told her [Mrs. Curtin] to get out of the house many times. She [Mrs. Curtin (?)] fussed with her and with me." Kate had something to do with Mrs. Curtin going to Carvel Hall "on two days' notice", [evidently while Mrs. Curtin was renting a room or rooms in Mary's house]. Kate heard Mary tell Mrs. Curtin she had to leave the house; "Mrs. Curtin and myself were quarrelling all the time. She would not let anybody in the room to clean it."

Kate recalls that Mrs. Curtin came and took Mary out with her "only that one time she took her out in the morning. * * * I don't know the date. * * * A few years or so [after Kate came down here]. She told me she was going out with Mrs. Curtin in the morning. * * * She was out a couple or three hours. I went to the door many times to see whether she was coming and I did not [sic.] And at last I saw her in the kitchen and I asked her where she was and she said she was on an errand with Mrs. Curtin and I said what was it. And she said, 'she asked me not to tell you,' and so she did not tell me. * * * She was very tired, and I made her a cup of coffee. And she lay down on the lounge and she slept all afternoon, when I had to wake her up for supper. [She did not eat very much supper], she was very, very tired." Kate first knew of Mary's will after Mary's death. She infers or assumes that the will was executed on the day described by her.

John Griffin's will is not before us. From the testimony it appears that the house was left to Mary and constituted all or substantially all her estate. John and Mary had a joint bank account which on January 27, 1940 amounted to $4025.24, on October 1, 1941 (before

his death) to $3497.77, on January 1, 1942 (after his death, about the time Kate began living with Mary) to $3104.67, on November 5, 1943 (when Mary's will was executed) to $1709.85, and at Mary's death to $284.83. On August 16, 1943 Kate opened, with a deposit of $3900.00, an Annapolis bank account, in her name in trust for her and Mary, "joint owners, subject to the order of either; the balance at the death of either to belong to the survivor". On November 5, 1943, the account amounted to $3500.00; on January 10, 1946, she deposited $3800.00; at Mary's death the account amounted to $820.04; the next day Kate withdrew $430.75. Kate brought that money [$3900.00 and presumably the subsequent $3800] from Philadelphia. She says, "My sister wanted me to bring down my money. I was going to live with her and bring it here. I was not going back to Philadelphia, long as she lived, and I wanted to be with her." She says the money she withdrew from her account during Mary's life "was spent on the home", i.e., on their joint expenses, except two or three hundred dollars for herself—and about $300 for her own hospital expenses, and she paid Mary's funeral bill [presumably out of the $430.75]. Why she should have paid the funeral expenses or, why if she did pay them, she should not collect them from the estate, does not appear.

Mrs. Curtin, her daughter and her son all testified at length and in detail to the long friendship and affection between Mary and the Curtin family. Evidently no similar relations existed between Kate and the Curtins. There is no evidence, except Kate's testimony, that there was ever any friction between Mary and any of the Curtins. Kate does not say there was any friction before or near the date of the will. Mrs. Norman, a high school teacher, a neighbor of Mary, who had known her since 1928, one of the witnesses for caveatrix, says she has heard Mary "mention them [the Curtins]. She was very fond of all of them, and Roland was closer to her than any of the rest. The only one of the family

I ever saw in the house was Mrs. Curtin. She used to have a room there for a while. I don't know how long." Mrs. Curtin says that from November, 1944 to July, 1945 she rented two rooms from Mary, and from January, 1947 to August, 1947 one room. Roland says he was in Annapolis from February, 1942, on duty at the Naval Academy in 1943, till he left to take a sea command about the middle of November, 1943. During his time at the Academy, when he stopped in to see her, they would talk about all kinds of things and many times she would say, "I am not going to be here much longer. I am going to leave you my house". She took him out in the garden to tell him she had made the will. She did not want Kate to know about it, "because Kate would raise so much good hell". "If she don't know about it, I won't have to answer to her about it." She said, "If Kate knew I done it, she would kill me, or tear it up. I do not want her to know about it, and we won't talk about it, and we don't want you to say anything about it."

Mrs. Curtin says John died in October, 1941; at Christmas Mary had two couples living in the house; Mary dictated to Mrs. Curtin a letter to Kate telling her to come in the afternoon of the 23d or the next morning, but that she would have to leave on the 26th because the people who lived there and occupied the rooms were coming back; after New Year's Mary told Mrs. Curtin Kate had "given up her place and come here with her robe and clothes to take care of me"; previously Mary and Mrs. Curtin had had an understanding that when the two couples left Mrs. Curtin would come back and live in the house with her and rent the house, let her have one room to rent to girls, but take over the expenses of the house and live with her; Mary said, "Now my sister has come. What can I do?"; Kate remained. After September, 1942 Mary put in an envelope a deed to John from his father, his father's will and his stepmother's will, came to Mrs. Curtin and asked her to keep them; in November, 1943 Mary came to Mrs. Curtin's

house and got the papers; she said she was going to make a will; Mrs. Curtin asked whether she had a lawyer, she said, "I want the daughter [Mrs. Duckett] of the man who drew these papers [the late Judge Nicholas H. Green]; Mrs. Curtin asked whether she had told Mrs. Duckett she was coming, she said "No", Mrs. Curtin said "I better phone". Mrs. Curtin called Mrs. Duckett and said, "I have a friend to make a will. Would you meet me at the front door of your office building". Mrs. Curtin was in a hurry, and Mrs. Duckett did meet her there. Mrs. Curtin said, "Here are the old wills. The only living relative I know of is her sister, who is now living with her"; Mary started to interrupt, Mrs. Curtin said, "Hush, I have not time," Mrs. Duckett said, "That's all right. She can tell me." Mrs. Curtin told of John's sister who was in a sisterhood of the church; Mrs. Curtin said, "I think she knows what it is all about", "You be sure she knows what she is doing and knows what it is all about", and left Mary at the front door on the first floor. Mary [later] walked out. Mrs. Curtin [had] asked her if she wanted a taxi and she said, "I don't want that. I am going to walk to the coal yard and pay a bill and order some coal". Mrs. Curtin says, "She wanted to and I suppose she did." A week or two later Mary came to Mrs. Curtin's house and said she wanted Mrs. Curtin to get the will, that she had left it at the lawyer's office, and wanted Mrs. Curtin to lock it up in the bank; Mrs. Curtin went up, Mary got the will, the will was sealed, they took it over, and Mrs. Curtin told the cashier that Mary wanted the papers locked up; he took them and handed Mrs. Curtin a receipt after checking what was in the envelope; he was going to give Mary the receipt, and she said, "No, give it to Mrs. Curtin"; Mary said she would like Mrs. Curtin to keep the receipt, she said, "Your have a safe deposit box. Put it in there", so Mrs. Curtin did; from the time the will was put in the bank until she died, "she never saw it and I never saw it."

Mrs. Ducket remembers that she went down and met Mary at the step at the front door; she believes Mrs. Curtin was the one who left here there. She says, "I took her back up the steps into my private office, and closed the door and she talked to me for about an hour. She told me what she wanted done very concisely, without pausing. Usually an elderly woman tells you this and that and the other thing. I was impressed with her definiteness and her conciseness. I did not stop there. I questioned her about her other relatives. She told me she had a sister Kate. She told me she had a sister-in-law, a sister of John. She told me her estate was the house. There was little money in the bank, but not too much—practically not a great deal left. I asked her if she cared to mention the sister of John in the will and she said she was a nun, and she understood she was not interested and could not receive it even if she left it to her. Then we talked about the papers. She seemed reluctant to talk about Kate, and she came back to the Curtins. She said 'They are like my own family. Captain Curtin is like my own baby. I want the property to go to him, and I would like to provide something for his mother for life.' I explained to her the legal phraseology to leave it for her life with remainder to Captain Curtin. She seemed to understand that and that is what she seemed to want. We went back to Kate, and I said, 'Tell me more about Kate. Is she living with you, or where does she live?' She told me she was living with her, 'living with her uninvited', and she said she drinks and she said she is to leave as soon as she has made arrangement to do so. We went back to the question of the will, the Curtins again, and I told her I would like to provide in the case of the death of the people mentioned in the will, and she said, 'Yes, yes'. That was what she thought important, particularly with Captain Curtin in the Navy and with the war going on. She then told me to provide his mother the power to will it. I went back to Kate again and she looked at me and said, 'Do I have to leave something to Kate? I owe her nothing'.

I said, 'You don't have to leave your property to your own children, much less your own sister.' There was nothing for me to tell her except, 'No, you don't have to leave your property in any particular way'. It came to me at that time how a lawyer can really make a will for his client; that if I did any more talking about Kate, if I even tried to tell her it would look better after she was dead if she did leave something to Kate in her will, it would be my will. It would not be Mary G. Griffin's will. She again told me she wanted Mrs. Curtin and Captain Curtin—she wanted the property to go to them. I felt I had gone as far as I could go in determining anything further in regard to her wishes. Her wishes were definite, and I was amazed to find there was any question of her mental capacity here. She was old, she was feeble, she was weak. She did not see well, but her mind, to my humble opinion, was very alert, very clear. * * * She impressed me as being clear-minded. She did not falter, and did not change back and forth as many people do when making a will."

The will was written up and executed the day she came to the office. "When we got through I asked her if she would like to wait a while, while the will was prepared. After all it was not difficult and would not take too long to be typed up. Or would she like me to come to the house to have it executed? And she told me she would rather wait and would like to have it signed right then. The will was typed and I talked to her in the meantime. I never noticed anything queer or peculiar about her. She stated her business and she does not elaborate. She does not ramble on. When people said she does not keep to one subject too long, I was surprised. We kept to one subject for about an hour, but I could well imagine this woman would not let people pry into her business that she did not want people to pry into. The will was finally typed and brought to me in the office and I gave it to her and asked Mary to read it. She said it would be difficult for her to read. She did not see too well, and she requested me to read it

for her. I read it to her and explained it paragraph by paragraph exactly as it is written in the will." Every word of it. "When she was signing it, she was very selfconscious, apologized for her signature,. said it probably would not be too straight. She could not write as well since her eyesight was failing, but I remember she said, 'Oh, I can see the line.' She followed the line along and signed it."

By the will the testatrix gave all her property to Mrs. Curtin for life and at her death to her son Roland, or if he should predecease his mother, as she might by will direct, and appointed her executrix without bond.

Mamie Dutton, a witness for caveatrix, says she had known Mary about nineteen years and Mary and Kate got along "very nicely indeed, splendid. She came over and cried many times and said she did not know what she would do without her sister." After John died, witness heard Mary discuss her property. "She was going to give it to her sister because her sister was so lovely to her. She was going to give it to her." That was on several occasions when she would get blue·and downhearted and talk it over with witness. "She asked her sister to come stay with her and said her sister was so lovely to her. She was going to leave everything to her. She repeated that dozens and dozens of times. Whether she meant it, I don't know." The same witness says, "After he died, she began looking about seeing funny little people. She would say, 'Look over there. You will see them looking in my hall there. They are running around'; and I would look over there and see no such thing." She insisted there were funny little people. "I tried to tell her and assure her of things but she still said they were there. Said they were funny little people. [She saw them] across the street and when she was on her dying bed she still saw them. [Since 1941] she had been seeing them all these years; she would come to the house where I stayed and say the same thing."

Another witness, Irene Jones, who had worked for Mary off and on from 1933 till she died, says Mary used to say, "If it were not for Kate I don't know what I would do. She is a lovely sister to me. As long as Kate and I live, this is our home". The same witness says, as to Mary's physical and mental condition, "She had begun to fail after he [John] died. She used to put down things and forget about them even while he was living and she did it more after he passed on and we could ask her where it was after she put it down and she said she did not know. She would light a cigarette and forget where she put it and light another one. That would still be lit. * * * she would say, 'Irene, fix those curtains so those folks cannot look at me', and I said, 'Mrs. Griffin, I do not see any'. But I fixed them because she asked me to. * * * She didn't say men. She said people. I would look and not see anything. I would say, 'I do not see anyone across the street', and she said, 'Pull down the shades', and I would fix the curtains as she wanted them." Mrs. Norman, the high school teacher, says Mary "said she did not know what in the world she would do without Kate. There was nothing in the world she could do to repay her. * * * [During 1942 and 1943] she was kind of old and after that she began to fail. With reference to her property "she did not say anything directly except to say that Kate had been the best kind of a sister. They were very close to each other. 'This is our home, and as long as Kate lives it is her home'. * * * She could not talk much. Mary could not remember much. [If you asked her questions,] she did not answer. She might evade some of them and then she would not tell you". * * * "Can you give some example of her feebleness of memory? A. I know she had the habit of leaving cigarettes down, because I picked them up myself off the burnt tables. She did not want to trust herself downtown. Outside of that I cannot say." Louis Senisi, another witness, who had worked with John and had known Mary since her marriage, says Mary and Kate "got along fine. Kate was wonder-

ful to her. * * * when she [Kate] came to live with her sister they got along wonderful with each other. * * * One day I was over there three or four years ago. She went down, and after she fell down, she could not walk any more. So one day she said, 'Mr. Senisi, I won't be here much longer and don't forget Kate after I am gone. I want you to come over here and take care of the house like you do for me.' She told me that different times. 'Don't forget Kate, I won't be here much longer.' " Mrs. Dorothy L. Hughes, who had known Mary only since March, 1945, says, "She told me one time on the porch— it was summer time, 'At her death everything she had would go to her sister Kate'. She made that statement definitely to me. When she was discussing Kate with me, she said, 'I don't know what I would do without Kate. She waits on me, she treats me like a baby.' * * * Our conversations were just like anybody else's going to visit any one. She would come to visit me, and I to see her." She could not hold a prolonged coherent conversation. "Q. Did you notice any queer or unusual acts or conduct or declaration by Mary since you knew her? A. Well, not that I would recall particularly".

Harley T. Williams, who had known Mary since September, 1947, when he took a room there, says Mary always said, "Nothing she [Kate] would not do for her sister, * * * Kate meant everything to me." She made no reference to any property, "except she said, 'This is mine and Kate's home' ". He says, "Miss Mary could not remember anything she had or what she did. She would light a cigarette and lay it down in the kitchen, and she was quite forgetful. One morning about six o'clock she set a wastebasket on fire. She was downstairs and lit a cigarette, and she had let me in her room and threw it in the wastebasket behind the door". He also says, "She said, 'I cannot write a receipt for you, but I will not charge you but once'. And she never did."

Except Dr. Edith Rodler, who first saw Mary on February 12, 1948, no physician who had ever seen her testified. Dr. Arnold Eichert, a psychiatrist at Crowns-

ville State Hospital, a witness for caveatrix, heard the testimony of all the other witnesses for caveatrix, and testified, over objection, that assuming the truth of all the testimony he had heard, his opinion is that on November 5, 1943 Mary was of unsound mind, incapable of making a valid deed or contract. He states that opinion "on the evidence that at the time of her death she was suffering from hardening of the arteries of the entire body", a chronic and progressive disease, "and the evidence indicates that in this case the progress probably started long before 1943. The reason I say that is that the symptoms of this illness are loss of memory, general breaking down of the body, and delusions and hallucinations of various sorts. We know that she was in failing health prior to 1943 and we know that before 1943 there was evidence of loss of memory, which was the little things she forgot around the house such as cigarettes lying around. As I understand it, she did it most frequently—more than expected of the average normal person. I might say that a lot of the symptoms are such as a normal person would show, but she showed them to an exaggerated degree. We have further evidence of the loss of memory from her conversation—she was unable to stick to one subject for any length of time. We have the evidence that before 1943 she saw, as one of the witnesses put it, 'funny little people'. Of course, any one can say or think they see somebody over there who is not there. As I get it, she saw these funny little people frequently, but not as normal men or women, but funny little people. Significant that she was interpreting the impressions in her mind in an unrealistic fashion. She was seeing something, not only that was not there but could not be there. I think that covers it. I want to repeat that her physical condition was failing at the time, or shortly after Mr. Griffin's death, and while the physical condition, in itself, does not necessarily mean the mental condition is serious, we use it as evidence to know that the process was going on. In other words, the body was wearing out and this wearing out was very

evident by her seeing things. [Hardening of the arteries] decreases the normal supply [of blood] to the brain so that the brain tissues are not properly nourished and the individual cannot think properly, the way the normal person can." This lessens the thinking faculties of the mind. On cross-examination, he said, Arteriosclerosis is a common ailment "among elderly people." There are people suffering from arteriosclerosis in severe form who are perfectly balanced mentally and able to transact their business after any age, "provided the arteriosclerosis does not affect the brain." You can tell when it affects the brain "at the point where the memory becomes poor". The name of her illness is "psychosis cerebral arteriosclerosis." " 'Psychosis' means an illness in which the person is incapable of knowing the difference between right and wrong. * * * I don't know whether she did [suffer from a condition that she did not know the difference between right and wrong.] I have not the evidence of that. * * * I am giving you what we call 'an educated guess.' I heard certain evidence and I formed an opinion on the basis of what I heard compounded on years of experience. * * * The most significant factor [that brings him to his opinion] is her seeing the funny little people. * * * I don't remember the words. It was one of the colored people, in fact, two of them. One of them said 'funny little people', and one said, 'People looking in the window'. She would look and see no one there. * * * You could not [see any funny little people, due to defective eyesight.] Defective eyesight might cause somebody to not be sure of what they saw, but normal people would not say they saw funny little people." There is in evidence indication of what type of people the funny little people were. "I remember one of the witnesses said she looked and saw no people. Then if people were walking down the street, why should they be funny? * * * The word 'guess', after all, is something without foundation. I think I have a foundation. It is based on evidence, I think I have evidence to form my opinion. Q. Would you say it is a conjecture? A. You may get

me into some word in saying a precise definition of that which I do not know. I am giving an opinion based on the evidence I heard."

The evidence presents a common, but uncommonly sharp, contrast between evidence on false issues and absence of evidence on the material issues. If the question for the jury were whether the will, when made, was an unjust will, or whether, after it was made, it became unjust and ought to have been changed, it may be assumed that there would have been evidence to go to the jury, at least on the latter question. If these were questions for juries, to be decided on the testimony of disappointed relatives and alleged oral statements by testators made before or after making their wills, few wills could stand against attack. Such questions are not questions for juries but for testators, to be determined by making wills with the formalities required by law.

Caveatrix contends that the provisions of this will show both undue influence and mental incapacity. "* * * the provisions of a will, no matter how unnatural or unjust they may be, are not in themselves, unaccompanied by extrinsic facts indicating that the execution of the will was the result of some influence or pressure exerted upon the testator, sufficient to create an inference that it was procured by undue influence". *Woodruff v. Linthicum*, 158 Md. 603, 610, 149 A. 454, 457, This doctrine has been recognized and applied in extreme cases of unjust and unnatural wills. *Drury v. King*, 182 Md. 64, 67-68, 32 A. 2d 371; *Saxton v. Krumm*, 107 Md. 393, 400, 68 A. 1056, 17 L. R. A., N. S., 477, 126 Am. St. Rep. 393; *Longanecker v. Sowers*, 148 Md. 584, 587, 129 A. 896. Anyone with sufficient faith in the depravity of mankind is at liberty to assume or suspect that Mrs. Curtin, her son, Mrs. Duckett, any one or more of them, in some unknown way, procured the making of this will by undue influence. But there is no evidence to support any such suspicion. There is nothing unnatural in a wish to give the property to the Curtins, who for at least forty out of the last forty-two years had apparently been much closer

to the testatrix than her sister. Whether this wish was greater than any wish to provide for her sister, only the testatrix could determine.

Nor can the provisions of a will, without additional evidence, constitute legally sufficient evidence of mental incapacity. *Horner v. Buckingham*, 103 Md. 556, 559-560, 64 A. 41; *Smith v. Biggs*, 171 Md. 528, 532, 189 A. 256; *Smith v. Shuppner*, 125 Md. 409, 416, 93 A. 514; *Cronin v. Kimble*, 156 Md. 489, 493, 144 A. 698. Statements, made in a will or when the will was made, at variance with alleged prior or subsequent oral statements, cannot be made evidence of mental incapacity by calling them delusions. *Berry v. Safe Deposit & Trust Co.*, 96 Md. 45, 54-56, 53 A. 720; *Plummer v. Livesay*, 185 Md. 450, 461-463, 44 A. 2d 919; cf. *Johnson v. Johnson*, 105 Md. 81, 65 A. 918, 121 Am. St. Rep. 570. The witness who testified that Mary said she was going to leave everything to Kate, and "repeated that dozens and dozens of times, "added, "Whether she meant it, I don't know." Nor do we. There is no evidence of delusion when Mary told Mrs. Duckett that Kate was "living with me uninvited", and "I owe her nothing." Even a sister may overstay her welcome, and the scope of an invitation may be misunderstood or repented. What, if anything, she "owed" her sister was a matter of her own opinion. In a pecuniary sense there is nothing to show that on November 5, 1943 she owed her anything. Kate herself testifies that she was invited, but not that the invitation was ever repeated or that Mary ever made any professions of obligation or gratitude to her or said anything about the "funny little people" who meant so much to Dr. Eichert.

There was no legally sufficient basis for Dr. Eichert's opinion. When evidence to show mental incapacity relates to circumstances which are not obscure and need no explanation by a physician, and are legally insufficient to support an inference of incapacity, the testimony of a medical expert is not admissible to show that he draws such an inference from such evidence, and if admitted, is

not legally sufficient to show incapacity. *Berry v. Safe Deposit & Trust Co., supra,* 96 Md. 58-62, 53 A. 724-726. Even the opinion of a family physician, which is admissible as such, is not legally sufficient to show incapacity, when the reasons he gives for his opinion are insufficient. *Horner v. Buckingham, supra,* 103 Md. 563-564, 64 A. 43-44. Since the *Berry* will case psychiatry has doubtless made great advances. But the differences between science and pseudo-science, between application of medical science in the field of medicine and application or misapplication of it in the courts, and between the legitimate roles of the judge and the expert witness, have not been obliterated or materially changed. *Cf. Maranto v. Maranto,* 192 Md. 214, 218, 64 A. 2d 144, 145. Dr. Eichert shows no special qualification to determine, from the meagre and trivial circumstances narrated in the testimony, whether Mary showed "to an exaggerated degree" symptoms a normal person would show, or did, "more than expected of the average normal person", things "every one does at some times or other." The more rare the "normal person" becomes in the eyes of the psychiatrist, the more necessary it is to remember that capacity to make a will is not limited to the "normal person"—still less to that statistical abstraction, the "average normal person", and that to invalidate a will an abnormality or delusion must actually impair testamentary capacity at the time when the will is made. Loss of memory and inability "to stick to one subject for any length of time" did not prevent Mary from carrying on a long consultation with Mrs. Duckett about her will or from remembering never to charge Mr. Williams a second time for rent paid. Ability to evade, or avoid answering, questions of an inquisitive acquaintance—or sister—requires some strength of mind and of will. Most of us at times engage in conversational chatter that may receive more concentrated attention than it deserves. A witness who said Mary could not hold a prolonged, coherent conversation also said, "Our conversations were just like anybody else's going to visit anyone." Capacity

to make a will does not necessarily include capacity to suffer bores gladly or habit of handling cigarettes with care. Mary had impaired eyesight, and apparently could not see persons across the street. She wanted her window shades kept down to avoid being seen by unseen observers. If she either imagined or invented "funny little people" they were as harmless as Santa Claus, and did not influence her will.

Dr. Eichert's definition of "psychosis" indicates confusion either as to the meaning of "psychosis" or "the meaning of meaning" or the difference between answering a question and asserting a conclusion or consequence —admittedly untenable—from an unstated answer. Scientific discoveries originate in hypotheses, which are primarily guesses. But before scientific hypotheses become facts or evidence of facts they become more than guesses. By calling his opinion an "educated guess" Dr. Eichert has not shown that it is more than a guess.

Disposition of the issue of mental incapacity necessarily includes disposition of the issue of knowledge of the contents of the will. If Mary was not mentally incompetent, Mrs. Duckett's testimony conclusively shows that the contents of the will were read to and known to her at the time it was executed.

Caveatrix denies the sufficiency of the evidence of execution of the will. If we assume, without deciding, that the rulings on that issue, after verdict on January 12, 1949, were appealable on June 3, 1949 because of the intervening motion for new trial on other issues, the point made is without merit. Due execution and attestation of the will, as recited in the attestation clause, was proved by the testimony of Mrs. Duckett, one of the attesting witnesses, who also testified that the other attesting witness, Mrs. Cowell, at the time of the trial was in Colorado. Mrs. Cowell's signature was proved, in accordance with Art. 93, sec. 368, by the testimony of Mrs. Duckett and another witness. If section 368 applies only "to wills that are produced and offered for probate" (*Tinnan v. Fitzpatrick,* 120 Md. 342, 349, 87 A.

802, 804), it applies not only in the Orphans' Court but also in the court of law on trial of issues. *Saxton v. Krumm,* 107 Md. 393, 401, 405, 68 A. 1056, 17 L. R. A., N. S., 477, 126 Am. St. Rep. 393; *Conrades v. Heller,* 119 Md. 448, 461, 87 A. 28. Independent of section 368, the attestation clause itself is *prima facie* evidence of due execution (*Conrades v. Heller, supra; Woodstock College of Baltimore County v. Hankey,* 129 Md. 675, 680, 99 A. 962; *Van Meter v. Van Meter,* 183 Md. 614, 619, 39 A. 2d 752); and Mrs. Duckett's testimony is conclusive evidence.

*Rulings affirmed and cause remanded.*