CLARENCE W. HORNER et al. *vs.* E. HERBERT BUCKINGHAM et al., Executors.

*Wills— Testamentary  Capacity—Medical  Expert—Sufficiency of Evidence.*

The provisions of a will may be of such a character as to indicate the mental incapacity of the testator when considered in connection with other evidence.

A testator whose estate amounted to $200,000, left surviving him a widow and two brothers, but no children. By his will he gave the income of his estate to his wife for life, and after her death he gave $10,000 to each of his brothers, $20,000 to his wife's sister, $20,000 to her children and the residue to two friends and certain charities, in designated proportions. *Held,* that there is nothing in these provisions tending to create a suspicion as to the capacity of the testator.

Upon the trial of a caveat to a will a medical man, who had attended the testator professionally, testified that in his opinion the testator was incompetent to make a valid deed or contract, and gave as his reason for that opinion that the testator suffered from chronic Bright's disease and that is a disease which must result, eventually, in causing mental deterioration. The witness testified to no conduct or words of the tes-

tator indicative of incapacity, and there was no evidence in the case to show that the disease had actually impaired the testator's mind at the time of executing the will or that he was then in fact, from any cause, mentally incompetent. *Held*, that this evidence is legally insufficient to overcome the presumption of sanity and competency, or to prove that the testator did not possess testamentary capacity.

Appeal from the Court of Common Pleas (DOBLER, J.)

The cause was argued before McSHERRY, C. J., BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*William Colton*, for the appellants.

*Robert H. Smith* and *Edgar H. Gans*, for the appellees.

PAGE J., delivered the opinion of the Court.

The tenth exception in this case is to the granting of the first prayer of the caveatees instructing the jury, that no legally sufficient evidence had been offered, that the testator, John William Horner, was of unsound mind and incapable of executing a valid deed or contract, on the thirtieth day of April, 1904, at the time of the execution of his will. By three other prayers of the caveatees the consideration of the other issues in the case, involving the formal execution of the will, undue influence fraud upon the testator, and ignorance on his part of the contents of the instrument, were also taken from the jury. The sole question presented by this appeal therefore, is was there legally sufficient evidence tending to show that the testator was not possessed of sufficient capacity to make a valid deed or contract, at the time the will was executed. The verdict having been against the caveators, they have appealed.

Inasmuch as it is not contended by the counsel of the caveators, that such evidence can be found elsewhere than in the evidence of Dr. Fetterhoff, and also in the particular disposition of the property made by the testator, it will not be necessary to examine with much particularity the testimony of the other witnesses in the case, except possibly as it throws light upon the character of the testator and his estate, and as to the persons with whom he was connected by blood or affinity or otherwise.

The testator died on the 11th of October, 1904; he made and executed his will on the 30th of April of the same year. He was about fifty years of age. He had been in business for many years, and had succeeded in amassing a considerable fortune, amounting to about two hundred thousand dollars, all of which with the exception of about $20,000 which he received from his brother Albertus estate, he had gathered by his own skill and industry. He had always been regarded as exceptionably competent, as a man of discretion and industry in business, and careful and prudent in his investments—without at any period of his life having had peculiarities of any kind. All the witnesses who speak on the subject, except Dr. Fetterhoff, agree with Mr. Pearson, one of his business friends as being one for whom they had great respect, who had worked hard, "with a face" bright and full of color, whose judgment they valued, a man of "happy nature", "muscular though not physically well developed," "level-headed in business," "perfectly reliable in any contract he should make and perfectly able to make it," and none of them had noticed anything different in him, up to the time of his death. He retired from business in 1899 and thereafter spent a large part of his time in travelling with his wife. Up to the day of his death, he acted always according to his own judgment in everything, and nothing that he said or did showed any mental weakness or peculiarity. The testimony shows there was some coolness between the members of his own family and those of his brothers, the caveators, but we need make no further reference to this, inasmuch as nothing appears in the evidence in connection with that, which is abnormal or in any respect tends to show that he was not in the full possession of a sound intellect.

The will was drawn by a lawyer of capacity and of eminent legal attainments, who in his evidence has given us all that occurred at the time of its execution. He states that Mr. Horner at that time by his conversation and conduct created the impression upon him, that he was a "clear-headed strong business man." Mr. Smith had previously drawn another

will for him which was executed in 1901. By that, a slight
money provision had been made for his mother-in-law, Mrs.
Milliman, and now that her death had occurred, Mr. Horner
desired that clause should be changed. He adopted Mr.
Smith's advice to make a new will instead of altering the old
will. The new will was like the first one, except the provi-
sion in her favor was omitted, and in addition a slight change
was made in the legacies to the charitable institutions; but
otherwise the provisions in the two wills were the same. The
final disposition of his property was therefore in accordance
with intentions formed by him, at least as far back as 1901.
If the contents of the will be examined, in the light of this
fact, taken in connection with all other circumstances, it is im-
possible to agree, with the contention of the appellant, that
the instrument, "reversed the cherished intentions of his life."
He left surviving him a widow (with whom it appears he had
lived on terms of close friendship), but no children, and two
brothers. Each of the brothers was in business for him-
self; and to each of them the testator had surrendered a large
portion of his share in the estate of his brother, Albertus, who
had died five years before. To his wife he gave the income
of his estate for life, with remainder as follows: Ten thousand
dollars each to his brothers, $20,000 to his wife's sister,
$20,000 to her children and the rest and residue to charities
mentioned, and two friends, in the proportions named. It is
true that the provisions of a will may furnish intrinsic evi-
dence, involving it in suspicion and tending to show the inca-
pacity of the testator, but standing alone, no matter how un-
just or apparently without known cause, they furnish only a
suspicious circumstance and *per se* are not ground for setting
aside the instrument. *Davis* v. *Calvert*, 5 Gill & Johnson,
301.

We do not regard the provisions of this will when consid-
ered in the light of the facts, as affording a suspicious circum-
stance bearing upon his mental capacity, but if we did, they
could not affect the point we now have in view, unless there
was some evidence in addition tending to show mental inca-

pacity. It is contended that such additional evidence, is to be found in the testimony of Dr. Fetterhoff and we will now proceed to inquire if that contention is well made. This witness was produced on the part of the appellant. He is one of the physicians who attended the testator in his last illness. He had an office near Mr. Horner's residence. He testifies that he attended him on April 14th, 1904. From 1902 he said he had attended Mr. Horner more or less frequently at his office, and once he had met him at Atlantic City. In 1902 he testified that he found the testator affected with Bright's disease nephritis, or as Dr. Blake afterwards described it, "chronic interstitial nephritis." He described the symptoms of the disease and was permitted to state his opinion that the testator on the 30th of April, 1904, was incompetent to make a valid deed or contract. On being cross-examined, he testified that Mr. Horner had talked but little with him, never discussed property with him, and that he did not know from anything he said who his relations were. The witness would not say he "was not competent to understand who his relatives were," "or what his property was," "but that there was in his physical condition, viewed from the standpoint of a physician, that which made it perfectly possible for him to forget his relatives" and "to forget who are his best friends and turn on them," &c. He stated "I can't base my judgment on questions I didn't discuss with him, but I can judge what his condition was from seeing him and from the standpoint of a physian. We quote from his evidence as follows, viz.:

Q. You can testify from any manifestations made by him?

A. I judge it by the manifestations and what he tells me. Certain things are subjective symptoms, and you depend on your patient for them. He told me he couldn't grasp things as he had, that he didn't appear to be able to think of things, that things seemed dark and cloudy and gloomy, that he felt as though he was under a cloud and might die at any moment. They were subjective symptoms, which indicated to my mind his mind was abnormal and morbid.

Q. Was he subject to any delusions, as to his relations, as far as you observed?

A. No, sir; not as far as I observed.

Q. Did you ever detect in him any specific delusions of any kind?

A. No, I can't say that I did.

Q. Did you ever detect in him any delusions, with respect to his property?

A. Well, he did say he believed there were persons trying to get his property from him; he believed there were persons who had designs on his property, but he didn't go into details.

Q. You didn't know whether that was true or not?

A. I didn't know whether it was true or not; no.

Q. Therefore, it couldn't be a delusion; you can't say whether it was true or not?

A. Of course not; I can only say he made the statement; whether the fact existed or not, I cannot say.

Q. You cannot say, therefore, in any talk with you there was any delusion manifested on his part, either as to his relatives or to his property?

A. Well, his general mannerism would indicate to me, and his method of conversation would indicate to me * * *

Q. Give this jury, if you can, any single instance in all your dealings with this man, of any delusion on his part with respect to his relatives or with respect to his property?

A. I don't recall a single thing that he did. Of course, I saw Mr. Horner only professionally, and all I know of his mental condition was what I knew as a physician, and from his statements to me. * * * I know he stated himself he didn't find he was capable of grasping things and considering things with the calm judgment he had been able to do in the past. That is what I formed my opinion on. I had nothing else to go on.

Q. Aren't you forming your opinion here from a physical condition which might eventuate in acts of insanity, or acts of incapacity?

A. Well, it might or might not eventuate in insanity, but it was reasonably sure to eventuate in acts of incapacity unless he died before he reached that point. A man chocked up with uremia has got to get in that condition. That is morally sure. And while that is so, of course, he may die before he reached that age when it will eventuate in acts of insanity.

Q. You are arguing now from the nature of a disease which might or might not so result?

A. I am arguing from the pathological condition of the patient. If he did not do it from some other cause in the

meantime, eventually he will arrive at a condition in which he would become incapacitated.   I am speaking from the time I saw him until he died.   And I think that for nine months before he was incapacitated, and until the time of his death·

Q. You have said that so often.   Now, please answer my question.   I am getting at your judgment as far as outward acts are concerned, and it is founded on one only, and that is his talk with you?

A. Statements he made at various times.

Q. His talk with you, in which he told you he couldn't grasp with as much judgment as he used to.   That is all you have said?

A. That was what he said to me.

Q. That was all the outward acts.   Everything else is based on your knowledge of his physical condition?

A. My knowledge of his physical condition.

Q. And that is all, isn't it?

A. Yes, sir.

Q. That is, it is an inference of yours, and you think his condition of mind was what it ought to be in a man who had a disease of that kind?

A. It was the condition of mind he said he was in; the condition of mind you would expect him to be in, the condition he said he was in.

Q. A man with chronic Bright's disease is incapable of acting intelligently?

A. I think so.

Q. Don't you know that many men have Bright's disease in an advanced form and go out and attend to business?

A. They go through the form, whether they actually attend to it capably or not, I don't know.

Q. You mean to say you don't know that people with Bright's disease in an advanced form are not doing that, are going around every day attending to their affairs?

A. Until the very hour they are taken with acute Bright's disease they are healthy.   You ask me if I don't know, as a matter of fact, of people going around the street and attending to their business up to the time they are taken with acute Bright's disease.   I say, yes.

Q. Your judgment as to this man's capacity is founded entirely upon his pathological condition and what that condition ought to eventuate in?

A. Upon his pathological condition and his statements to me.

This testimony of this physician does not go the extent of furnishing facts showing what the manifestation of the testator's mental operation was. He knows of no conduct or speech, that tends to show mental incapacity. His opinion is founded only upon what he thinks ought to be the mental condition of one who has been affected with Bright's disease of the particular nature and kind, with which Mr. Horner was afflicted. But he observed no manifestation of it at all and nothing to show that the stage had been reached, where mental infirmity had supervened. The question in the case, is not whether Bright's disease in its usual course may or may not induce mental incapacity, but, if that were a fact to be conceded, whether in this particular case at the time of making of the will, that result had been reached, so that the patient was then mentally so incapacitated as to be unable to make a valid deed or contract. · That much depends upon facts tending to show to the satisfaction of the Court and jury that his mind is diseased. Evidence that the person has a disease which may or must eventuate in mental disease cannot prove, or standing alone tend to prove, that at a given point of time that he is actually so afflicted. The tendency to mental infirmity, cannot *per se* prove the infirmity, it must be shown by facts. If a person has always shown through many years a high degree of mental soundness, in fact through his entire life, a jury ought not to be permitted to pronounce him insane, merely because a medical expert can be found who will testify that he is affected with a disease, that may eventually produce insanity, without other facts being shown that tend to prove that his speech or conduct is such as reasonably warrant the conclusion that such point has actually been reached.

Is a jury to be told by the Judge that they can find that a man with chronic Bright's disease, is incapable of acting intelligently, although the expert when asked if he does not know that many men with Bright's disease attend to business makes reply that "they go through the form, but he does not know whether they actually do." In fact the testator's capacity was a question for the jury, to be determined by them from

all the facts legally tending to prove it, and when these facts are not obscure and need no interpretation or explanation from a medical expert, they are for the jury to decide upon, if in the judgment of the Court they are sufficient to warrant the jury in finding from them that the testator was incompetent. *Berry* v. *Safe Deposit Co.*, 96 Md. 60-61.

We are therefore of the opinion that the testimony of Dr. Fetterhof does not tend legally to establish the incompetency of the testator, and thus set aside the presumption of sanity and competency "to which every man is entitled until overthrown by competent proof." *Gessel* v. *Baugher*, 100 Md. 684.

It follows the tenth prayer was properly granted.

It is unnecessary to examine the exceptions as to the admission of evidence, for the reason that if all that was rejected were admitted, it could not alter the final result.

The judgment will therefore be affirmed.

*Judgment affirmed.*

(Decided June 15th, 1906.)