## SACHS, ET AL. v. LITTLE, EXECUTOR OF THE ESTATE OF EDWARD A. LITTLE

[No. 32, September Term, 1966.]

*Decided February 9, 1967.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, BARNES, McWILLIAMS and FINAN, JJ.

*Daniel W. Moylan* and *David W. Byron,* with whom were *E. Stuart Bushong, Bushong, Byron & Moylan* and *McCauley, Cooey & Berkson* on the brief, for appellants.

*John A. Latimer, Jr.,* and *Evan Crossley,* with whom was *Samuel C. Strite* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The will of Edward A. Little, a bachelor, executed by the testator on December 30, 1959, was challenged in the Orphans' Court for Washington County by a caveat filed on January 15, 1965, by Bertha Little Sachs (Bertha), the surviving sister of the testator. Later, on April 20, 1965, fourteen surviving nieces and nephews, also filed a caveat.

The caveatee, Philip N. Little (Philip), a nephew of the testator and the executor named in the will, which was admitted to probate on January 12, 1965, filed his answers to the caveats. Issues were duly framed by the Orphans' Court for trial before a jury in the Circuit Court for Washington County. The issues presented the usual questions of mental incapacity, undue influence, fraud and certain other alleged grounds of invalidity.

The case came on before the Circuit Court (Chief Judge McLaughlin) and a jury, on June 28 and 29, 1965. At the end of the caveator's case, the trial court upon motion by the caveatee directed a verdict for the caveatee on all issues except that of mental incapacity. Later at the conclusion of the whole case the caveatee again offered a motion for a directed verdict. The trial court reserved its ruling at that time and charged the jury that the sole issue before the jury was that of mental incapacity as "the Court has ruled as a matter of law that the other things that were alleged to invalidate the will were not substantiated by any evidence, so, therefore, as a matter of law, the Court ruled on those various issues." No exceptions were taken to the court's charge. The jury was unable to agree, and a mistrial declared. The caveatee, pursuant to Maryland Rule 563 b 2,[1] filed a motion for a judgment n.o.v. which the trial court granted on August 3, 1965, filing a comprehensive and well-considered opinion and entering judgment in favor of the caveatee against the caveators for costs. This appeal followed.

The testator was born on March 7, 1875, and died on January 6, 1965, at the age of 89 (within two months of being ninety years of age). The challenged will was executed by him on December 30, 1959, when he was 83 years of age. The will is a simple one. It bequeathed $1000 to the testator's sister,

---

1. Maryland Rule 563 b 2 provides: "If no verdict was returned, the court may direct the entry of judgment as if the requested verdict had been directed, or may order a new trial."

Bertha; $1000 to his brother Thomas Little (Thomas), who also survived him; $1000 to St. Peter's Roman Catholic Church in Hancock (where the testator had been a regular communicant all his life); and $500 to the priest of that church for saying Masses on behalf of the testator after his death. The residue of the estate was bequeathed to his nephew Philip and Chlorous L. Little (Chlorous), his wife, "as tenants by the entireties, absolutely." Philip was named as executor with the request that he be excused from giving bond. The subscribing witnesses were Brooks F. Smith (Brooks), the executive vice president of the Hancock Bank, and Juliana W. Ayers (Juliana), the cashier of that bank. The word "April" was stricken out by having a line drawn through it by a pen and the abbreviation "Dec." was inserted below the word stricken out, so that the will was executed, as all agree, on December 30, 1959.

There is little dispute about many of the facts. The testator was born and raised in Hancock. His brothers Benjamin (who predeceased the testator) and Thomas had a store next to the testator's home. After his mother and father died in 1925 and 1926, the testator lived by himself. He never married and continued to live alone. His brother, Thomas, described him as a recluse, who did not want anyone "to bother him," he "became sort of miserly." He spent his adult years working for the Hancock Bank, ultimately becoming cashier of the bank, and a member and secretary of the Board of Directors. He resigned as cashier in 1951 and continued as a member and secretary of the Board until his resignation on December 30, 1958.

The evidence shows that the testator was stubborn, irascible, unresponsive, uncommunicative, and strong willed. He was slovenly and ill-kept throughout his life. He lived alone in squalor and refused to admit people to his home except on rare occasions. However, he was quite attentive to his duties at the Hancock Bank until he retired as cashier in 1951. After that retirement, he would each day, except Sunday, visit the Post Office, pick up his newspaper and go to the Board Room of the Bank, read his mail, prepare any deposits and then return home. He invested his money in stocks and bonds—always buying but never selling any securities. At the time of his death on January 6, 1965, his estate was valued at approximately $700,-

000. He was a faithful communicant at St. Peter's Roman Catholic Church, attending Mass and receiving communion each Sunday. His general health apparently was good until 1958 when he began to suffer from an accute prostate condition. He also suffered from arteriosclerosis. He was admitted to the Washington County Hospital in Hagerstown on June 30, 1958, when the prostate condition had become acute with attendant difficulty in urination. He was catheterized and thereafter had temporary relief except for the pain engendered by the presence of the catheter. He left the hospital on July 16, 1958, for further catheter drainage, the hospital report indicating that he would return later for surgery. He then went to the Hancock Nursing Home with an indwelling catheter to rest until his return to the hospital for the operation. He returned to the hospital on August 28, 1958, and was examined on September 1, 1958. Doctor Warden's report of his physical examination indicated that the patient was in better condition than when he was discharged. Dr. Warden successfully performed a transurethral resection of the testator's prostate the following day, September 2, 1958. The testator was uncooperative for a time after the operation—attempting to get out of bed, swearing and making a general nuisance of himself. He improved, however, and at the time of his discharge on September 13, 1958, the hospital report indicated that "he was voiding in a satisfactory manner." Thereafter he returned to the Hancock Nursing Home where he remained until September 13, 1959, when he moved to the home of his brother, Thomas, near his own home place.

The testator was re-admitted to the Washington County Hospital on October 21, 1959, suffering from "severe gross hematuria." He was "very uncomfortable because of a full bladder." A spinal anesthesia was administered and obstructions were removed from the bladder. After several days, with periods of restlessness and disturbance, the testator was discharged on October 29, 1959, the hospital report indicating that he was "fairly comfortable." He then returned to the home of Thomas. On December 4, 1959, he fell, sustaining a hairline facture of the pelvis. The testator was removed to Berkeley Springs Hospital where x-rays were taken and, contrary to the recommendations of the hospital authorities, he insisted on returning to Thomas' home the same day—which he did on foot.

## The Making of the Will

The testator not having made a will, Bernard Little (Bernard), a nephew and one of the caveators, in March 1959 went from Baltimore to Hancock to visit his Uncle Ed. Bernard had previously discussed the making of a will by his uncle with Father Kerr, pastor of the testator's church, and suggested to Father Kerr that he influence his uncle to make a will. On his second visit to his uncle in late March, 1959, Bernard suggested to his Uncle Ed that he make a will. His suggestion was apparently not appreciated by his uncle. Bernard described the result of the interview as follows:

> "He was downright discourteous to me and ordered
> me out of the room. He told me to get the hell out."

Father Kerr, who administered to the testator and brought him his communion at regular intervals, testified that he had discussed with the testator the advisibility of making a will and reported later that in a subsequent conversation with him, Mr. Little "had followed his suggestion." In a conversation a week later with Mr. Little, Father Kerr learned that "he had had a lawyer draw up the Will" and, at a still later time, that the will had not been signed by the testator.

It is to be observed that the original suggestion to make a will was directly made to the testator by Bernard, one of the caveators, and thereafter indirectly through Father Kerr. As Bernard testified: "I am the one who pinpointed the whole thing."

Philip testified that his Uncle Ed had requested him in April 1959 to have an attorney prepare a will for him, giving him explicit instructions of what the will would contain. Philip relayed these instructions to an attorney who prepared the proposed will in accordance with the instructions. This proposed will was given to the testator later in April. The testator put it in his coat pocket stating: "I won't sign it right now. I may want to make some changes later on."

The testator kept the proposed will unsigned until December 30, 1959. On that day, in the middle of the morning, the testator asked Chlorous to go to the bank and "ask Mr. Smith

and Julie Ayers if they will come down to the house." He did not state for what purpose he wanted them. She drove down to the bank and delivered the message. The two officials of the bank came to the house. Chlorous let them in and then left.

Brooks Smith testified that the testator took the proposed will from his pocket to sign and asked him and Juliana to witness it. He stated that it was his will and asked Brooks if he wanted to read it, but Brooks declined to do this. After the will was signed, the witnesses visited for a while and the testator offered Brooks a cigar. No one was in the room when the will was signed other than the testator and the two witnesses. Thomas came in later but no one mentioned to him that a will had been signed.

The evening the will was signed—or the next morning—the testator gave the executed will to Philip to put "in a safe place with these other stocks." Philip carried out these instructions and later delivered the will to the Orphans' Court.

Other facts will be stated in discussing the issues presented to us in this appeal.

### Questions Presented

The caveators urge four questions:

(1) Did the trial court err in declining to permit the lay witnesses for the caveators to express an opinion that the testator lacked testamentary capacity on December 30, 1959?

(2) Did the trial court err in ruling that an insufficient foundation had been laid by the caveators to support the opinion of Dr. Manfred S. Guttmacher that the testator lacked testamentary capacity on December 30, 1959?

(3) Was the evidence, when viewed in the light most favorable to the caveators, legally sufficient to be submitted to the jury on the issue of the testator's testamentary capacity on December 30, 1959?

(4) Was the evidence when viewed in the light most favorable to the caveators, legally sufficient to be submitted to the jury on the issue of undue influence in the preparation and execution of the will dated December 30, 1959?

We are of the opinion that all of these questions must be answered in the negative, and the judgment of the trial court must be affirmed.

### (1) Lay Witnesses

We recently reviewed the Maryland law in regard to the admissibility of opinion testimony by lay witnesses in cases involving challenges to wills because of alleged mental incapacity in *Ingalls v. Trustees,* 244 Md. 243, 257-59, 223 A. 2d 778, 785-86 (1966). We followed and quoted with approval from the opinion of the Court in *Doyle v. Rody,* 180 Md. 471, 481, 25 A. 2d 457, 462 (1942) as follows:

> "But a non-expert witness is qualified to express an opinion as to a testator's mental capacity only where the acts and circumstances, of which the witness had personal knowledge, are sufficient to form a basis for the formation of rational opinion. He must state the facts as far as he can and disclose what led to his conclusion. If the whole testimony of the witness fails to show facts sufficient to justify the conclusion reached by him, he should not be permitted to express an opinion."

The lay witness must not only have an ample opportunity to observe the testator but the facts relied on by the lay witness must be sufficient to establish a lack of testamentary capacity. *Plummer v. Livesay,* 185 Md. 450, 44 A. 2d 919 (1946).

Seven of the lay witnesses who testified for the caveators were asked to give their opinion as to whether the testator on December 30, 1959, was of sound and disposing mind and capable of executing a valid deed or contract. The trial court sustained the objection of the caveatee to the question addressed to six of the witnesses, overruled the objection to that question addressed to Winifred Sachs Byers, but later changed its ruling—properly, we think—and ruled that her opinion that the testator lacked testamentary capacity on December 30, 1959, should not be considered by the jury.

We will now consider the substance of the testimony of the seven lay witnesses.

Edward M. Bearinger, the operator of the Hancock Nursing Home in which the testator was a patient from July 16, 1958, to September 13, 1959, testified that the testator was a very unusual patient. He could not get a conversation out of him. The

testator was very rough with the nurses, used profanity and objected strenuously when the piano, in the room just below his room, was played. The testator indicated that he was not able to afford the expense of the nursing home. The testator would not carry on a conversation regardless of who came to see him—relatives or nurses. The testator was very independent and when permitted to walk to church, resented having the witness or other employees at the nursing home accompany him. In fact, he would order the witness to go back and would curse at him. The testator pulled out the catheter. The witness admitted on cross-examination that the testator paid his own bills at the nursing home by check, gave the witness a check for $125 every month and usually had the checks already prepared and signed before the testator was asked for them. The witness stated that the testator was a strong-willed person, "stubborn as could be," but he added "If you knew how to attack him, he wasn't strong at all." He was a man difficult to influence in financial matters.

The witness did not see the testator for more than three months prior to the execution of the will and, in any event, did not testify to conduct which would justify an opinion that the testator lacked testamentary capacity on December 30, 1959. See *Ingalls v. Trustees, supra.*

Fred C. Cunningham lived at the Hancock Nursing Home with his wife, Carrie, who was employed at the home. He observed the testator when he was there. He testified to the same effect as Mr. Bearinger and the trial court properly refused to permit him to give his opinion in regard to the testator's mental capacity on December 30, 1959, for the same reasons we have given in regard to Mr. Bearinger.

Bernard Little, a nephew of the testator, who lived in Baltimore City after he moved from Hancock, saw the testator when Benjamin Philip Little, the father of the witness and the brother of the testator was buried on April 2, 1958. He noticed that the testator was shabbily dressed and at the buffet reception after the funeral, the testator ate very poorly and dropped his food. The witness also stated that his uncle was never clean and dressed shabbily "during the last years." He did not talk and engage in too much conversation. As already indicated, Bernard

had requested Father Kerr to influence the testator to make a will in March 1959 and when Bernard visited his uncle at the nursing home in March, 1959 he, himself, suggested to his uncle that he make a will, whereupon his uncle, as we have already indicated, was discourteous to his nephew. Bernard had suggested to his uncle that he leave all of his property to St. Peter's Roman Catholic Church and when he refused to do this, suggested that he leave it to a hospital that would bear his name. The testator refused to do this and he "became very angry about it." The witness saw the testator when he had returned to Thomas' home in the fall of 1959 at which time the testator did not recognize him and complained about cheap cigars. One time the testator slept with his hat on. He was very shabbily dressed and would not carry on a conversation with Bernard.

On cross-examination, Bernard admitted that he had no hesitancy in suggesting to Father Kerr that the testator make a will in March, 1959.

Bernard was obviously of the opinion that his uncle, the testator, was mentally competent to execute a will in March and April of 1959. On the few occasions he saw his uncle after April of 1959, the lack of recognition on one occasion, and sloppy dressing and going to sleep one time with his hat on, would most certainly not support an opinion that the testator lacked mental capacity on December 30, 1959.

Myrtle Little Palmer, a niece of the testator, who moved to Baltimore from Hancock, recalled seeing the testator on weekends in Hancock. She did not visit him when he was at the Washington County Hospital, but did visit him after Mass on Sunday when he was in the nursing home. She also visited him after he returned to Thomas' home. She saw him on Christmas 1959. He was very dirty and would be sitting in a chair with a cigar in his mouth. The testator did not recognize her on these occasions, but after she introduced herself, he said, "Ben has red hair didn't he." Ben, the father of the witness, did have sandy red hair when a younger man. The trial court was clearly correct in sustaining the objection to the question of whether in the opinion of the witness, the testator had testamentary capacity on December 30, 1959.

Gorman B. Palmer, the husband of Myrtle Little Palmer, testified that the testator did not recognize him when he visited the testator with Myrtle, that the testator would never make conversation, he would doze off and go to sleep when the visitors were there and he was very dirty. Here again there were not sufficient facts given to justify the expression of an opinion in regard to the testamentary capacity of the testator on December 30, 1959.

Winifred Sachs Byers, a niece of the testator, testified that she had grown up in Hancock, and that the testator was a frequent visitor in the family home. He would go to dinner at her mother's home frequently but at times had dinner at the home of the witness. She saw the testator in the Washington County Hospital. At that time his head was dirty, part of the dirt looked like a scab and he ate his ice cream ravenously and so fast that he got a terrible headache. She used to visit him at the nursing home on an average of once a week. He failed to recognize her when he had not seen her for sometime. His food was spilled down all over him. His sense of humor was gone. He told her he didn't like to read magazines any more because he didn't remember the theme of the story. He was "touchy and irritable." When she and her father visited the testator on December 26, 1959, he asked her father how much money he had in the bank. Mrs. Byers testified:

> "Daddy said, 'I'll look at your bank book, it is in your pocket,' and he looked at it and he just didn't believe it was there and then he would ask again how much money he had and Daddy said, 'You have stocks, too,' and he said, 'No, something happened to my stocks.' And Daddy said, 'Why do you say that', and he said, 'I don't ever see my dividend checks any more.' Actually to say he talked to me while he was at Tom's would be an overstatement. He didn't actually talk to me very much at all."

As already set forth, the trial court permitted Winifred to state that in her opinion the testator was not capable of executing a valid deed or contract in December, 1959, on the ground that she had presented facts from which the jury might infer

that the testator did not know the amount or situation of his property in December, 1959. Later, after hearing the testimony of Frank B. Sachs, the father of Winifred who was present with her at her visit on December 26, the trial court changed its ruling.

Frank B. Sachs, the father of Winifred and husband of Bertha, a caveator and surviving sister of the testator, testified that prior to the testator's going to the hospital in 1958, the condition of the testator's home was terrible, the windows never washed, the floor never cleaned and cigar boxes were piled on the old dining room table. The testator never wanted visitors. He was filthy dirty. His toenails were about one-half inch long. In regard to the episode about the stocks, the witness testified:

"Q. Did he discuss stocks with you when he was at Tom's house? A. Oh no. He said he didn't have any.

"Q. He what? A. He said he didn't have any. When I would try to bring it up, he would say that he didn't have any.

"Q. What did you say about that? A. I said Ed, you never sold any. You have told me all my life that you never sold any stock, and I said, 'You surely have stock because you didn't sell it.' And he smiled and said, 'I don't know what happened, I didn't have any.' Later on, he said, and I said, 'Why how did you get rid of your stock—no one stole them from you, no one is going to do that, they couldn't use them' and then he said, 'I don't see any dividend checks any more.' Just like that. Now, I talked to Tom about the dividends and I said, 'What's wrong Tom?' and Tom said, 'We don't show them to him any more, he just loses them and tears them up and loses them around the place,' and he said that they didn't show them to him any more. * * *

"Q. When he was at Tom's house after he left the Nursing Home, do you know where he kept the pass book? A. Yes, he always wore a suit coat, the same as he wore in the bank and he had it just like this (indicating inside pocket) in his pocket.

"Q. He would keep it in his inside coat pocket? A. Yes.

"Q. Would he ever say anything to you about his savings account? A. This was a ritual. I would no more than go into Tom's house and he would say, 'Frank, how much money do I have in the bank? Will you go to the bank and find out?', and I would say, 'Ed, you have it right in this book inside your coat pocket' and he would open it up and look at it and then he would put it back in again, and then he would say, 'Will you go to the bank and find out just how much money I have in the Bank?' and then I would say, 'Ed, you just looked at your bank account, what you call your interest account.' I would call it savings account.

\* \* \*

"Q. Would he ask Tom how much he had? A. Yes, he would ask Tom and Tom would say, 'Oh, you got $1300', something like that in the bank and I would criticize Tom for it.

"Q. Would you ask Tom why he said that? A. He said he would take his money out of the bank. He said if you tell him how much he has, he would take it out of the bank and I said, 'He's a banker, he certainly would trust the bank.' "

The witness also testified that once when he was with Thomas and the testator in the nursing home, Chlorous brought a tray of food, handed it to Thomas and walked out. The testator looked up at Thomas and said, "who was that woman who just went out of here."

The witness also testified that the testator at times, could not remember the name of his doctor, Dr. Warden.

The trial court correctly sustained the objection to a question directed to the witness as to whether the testator was competent in December 1959, and with the explanation given by the witness in regard to the dividend checks and what Thomas told the testator about his bank account, correctly changed its ruling in regard to Winifred's opinion testimony.

In our opinion, the facts given by the lay witnesses were little more than a description of certain physical infirmities and certain odd traits of character which had been characteristic of the testator during his adult life. He was shabbily dressed, dirty, self-willed and stubborn, self-reliant, resentful of interference by others in his affairs, miserly and uncommunicative. He did not want visitors and clearly did not want suggestions in regard to how he should bequeath his property. In our opinion, these facts were far from sufficient to justify a lay opinion that the testator lacked testamentary capacity on December 30, 1959. See *Arbogast v. MacMillan*, 221 Md. 516, 158 A. 2d 97 (1960) and *Giardina v. Wannen*, 228 Md. 116, 179 A. 2d 357 (1962). We have held that a testator who was over eighty years of age, who suffered from arteriosclerosis and, at times failed to recognize a person who had been his attorney for many years or a person who had been a tenant for many years on the testator's farm, was not sufficient to justify a lay witness to give an opinion in regard to the testator's testamentary capacity at some later time. *Ingalls v. Trustees, supra.* In our opinion, the facts given by the respective lay witnesses would not justify their giving of opinions in regard to the testator's testamentary capacity on December 30, 1959, and the trial court properly ruled that they could not give such opinions.

## (2) Other Witnesses

In addition to the testimony of the seven witnesses above set forth in some detail, the caveators offered the testimony of Bertha W. Sachs, the sister of the testator, Jean E. Little, Gary Little, James W. Bevans, Philip James Bevans, James W. Sachs, nephews of the testator, Mary Josephine Kreig, a niece of the testator, and Gorman B. Palmer, the husband of a niece of the testator. The caveators also offered the testimony of Howard Kaylor, a broker who had reviewed the stock certificates of the testator and who testified that with six exceptions, all of the certificates dated 1958 or later were due to stock splits, stock dividends or rights offered by the companies.

The sister, niece and nephews mentioned were not asked if they had an opinion in regard to the testator's testamentary capacity on December 30, 1959. Their testimony was largely repetitious of that of the lay witnesses from whom an opinion in

regard to the testator's testamentary capacity on December 30, 1959 was elicited, i.e., that the testator lived in dirty surroundings, was dirty, uncommunicative and miserly. Bertha did testify that the testator told her that when he was in the nursing home in September, 1959 that Chlorous was pacing the floor until twelve o'clock at night and trying to make him make a will. Mr. Palmer testified that the testator never did recognize him.

In addition to this testimony, the parties stipulated that the testator's savings bank account in the Hancock bank was opened on December 1, 1934, with a deposit of $1200. The account had varying balances thereafter until in December 1959 the balance was $27,365; in December 1960, it was $51,295 and in 1961 it was $57,881. He resigned as cashier of the Hancock Bank in 1951 and from the Board of Directors on December 30, 1958.

The caveators then offered the testimony of Dr. Manfred S. Guttmacher, a well-qualified psychiatrist licensed to practice medicine in Maryland, to express an opinion upon the testamentary capacity of the testator on December 30, 1959. Dr. Guttmacher had heard the testimony of all of the witnesses theretofore offered by the caveators and had examined the medical records, both for the October 1959 stay at the hospital and for the December 1960 hospitalization, the later occurring approximately eleven months *after* the will of December 30, 1959 was executed. Dr. Guttmacher had never seen the testator during his lifetime and, of course, did not have the benefit of hearing the testimony later offered by the caveatee, including the testimony of the attending physician as well as the quite impressive documentary evidence indicating the testator's mental competence during 1958, 1959, 1960 and 1961.

From the 1959 medical reports, Dr. Warden's diagnosis of the testator's condition indicated that he suffered from generalized arteriosclerosis and a benign prostate hypertrophy—that is a non-malignant tumor of the prostate glands. Dr. Guttmacher indicated that the nurses' notes during the October 1959 hospitalization indicated the following:

"October 21—8:00 P.M.—Very uncooperative to nursing care, very demanding, * * * using profane

language loudly. * * * 9:00 P.M.—Appears to be disturbing other patients.

* * *

"October 23—6:00 A.M.—* * * Side rails up. Got out of bed several times, uncooperative, using profane language.

* * *

"October 24—2:10 A.M.—Very loud and profane; trying to get out of bed; very combative and loud; Dr. Warden called by nurse. * * * 7:30 A.M. Pt [patient] very restless, loud and noisy. Trying to get out of bed. Restraints applied (wrist). Seen by Dr. Warden.

* * *

"October 25—6:00 A.M.—Slept very well. Quiet night. * * * 7:30 A.M.—Quiet and cooperative this a.m. Well oriented. * * * 1:00 P.M.—Seemingly good p.m. Appears comf."

It is to be noted also that on October 26, 1959, the nurses' report shows:

"1:00 P.M.—States, 'I feel pretty good.' Seems very quiet. * * * 9:00 P.M.—Quiet eve. No complaints."

Similar reports were entered until the testator was discharged from the hospital on October 29, 1959, the last notation being "left floor, ambulatory." Dr. Guttmacher also considered the nurses' reports in December 1960 which showed:

"December 13—2:00 P.M.—Generally uncooperative. * * * 9:00 P.M.—Seems confused at times. Constantly gets out of bed asking for help. * * *

"December 14—6:00 A.M. * * * Up walking in hall at times. Confused at times. Fairly quiet after 3:00 a.m. No complaints. * * * 7:30 A.M.—Seems restless and slightly confused—no complaints. * * *

"December 15—9:10 P.M.—Very noisy. Annoying other pts. Dr. Warden notified. * * *

"December 16—2:00 P.M. — Up in chair. * * *
Appears more oriented. * * * 11:00-12:00 P.M.—
Sleeping. * * *

"December 17—2:00 P.M. — Patient up in chair
most of day. Rather quiet and cooperative today. 3:00
P.M.—In chair reading paper—no complaints."

Between December 18 and December 26, when the testator left
the hospital there were other notes of swearing and refusing
medications, restlessness and noisy behavior, as well as periods
of quiet and cooperation.

Dr. Guttmacher was of the opinion from the evidence he had
heard and the medical records that the testator was suffering
from senile dementia, and was, subject to exception, permitted
by the trial court to give his opinion that on December 30, 1959,
the testator was not of sound and disposing mind and capable
of executing a valid deed or contract. The jury considered his
opinion. Later, after the jury disagreed and was discharged, the
trial court properly concluded, in considering the motion for a
judgment n.o.v. for the caveatee, that under the decisions of
this court, there was not sufficient evidence to lay a foundation
for Dr. Guttmacher's opinion.

The reason given by Dr. Guttmacher for his opinion was that
the testator was suffering from senile dementia. This disease is
legally defined in 94 Corpus Juris Secundum, "Wills" §27 page
725 as follows:

"Senile Dementia does not necessarily result in men-
tal incapacity to make a will, but there must be such a
failure of mind as will deprive the testator of the power
of intelligent action. The disease is progressive in na-
ture, as discussed in Insane Persons §2 d, and it must
be determined whether its progress has so impaired
the faculties of the testator that they fall below the
mark of legal capacity. This must be determined not
alone by the nature and tendency of the disease, but
by its effect in the particular case; *but it is extremely
difficult to determine at just what stage in the prog-
ress of senile dementia the mind is incapable of
functioning intelligently.*" (Emphasis supplied).

Dr. Guttmacher was in agreement with this statement. He stated:

"Of course, the continuum from health to disease in many instances is not marked by any common points. This is not only true of psychiatry, but it is true of other conditions as well. A patient may have some increase in blood pressure but just exactly where you say the patient is suffering from hypertension, there is no clear cut-off point, and the same thing could be true of diabetes. You can run a blood sugar a little elevated and just where you say the patient has diabetes, and just where you say you have some elevation of blood sugar—*the same thing is true between senility and senile dementia.*" (Emphasis supplied).

Although Dr. Guttmacher did not consider the evidence later offered by the caveatee and the documents already referred to, counsel for the caveatee did ask him whether he found any significance in the testimony that after the testator returned to Thomas' home from the nursing home, he made out, wrote and signed checks. Dr. Guttmacher replied:

"Well, I think it is *rather interesting and rather remarkable* but first of all, I don't know with what accuracy they were done, and secondly, it does seem to me that this is the particular thing in this particular man that would be preserved beyond other things which he might be able to carry on." (Emphasis supplied).

As we have indicated, we are of the opinion, that under the prior decisions of this Court, the trial court properly concluded that there was not sufficient evidence to lay a foundation for Dr. Guttmacher's opinion. See *Sellers v. Qualls,* 206 Md. 58, 110 A. 2d 73 (1954); *Grant v. Curtin,* 194 Md. 363, 71 A. 2d 304 (1950); *Horner v. Buckingham,* 103 Md. 556, 64 Atl. 41 (1906); and *Berry v. Safe Deposit Co.* (The Berry Will case), 96 Md. 45, 53 Atl. 720 (1902).

As we said in *Sellers v. Qualls, supra,* 206 Md. at 67-68, 110 A. 2d at 78:

"The proffered opinion testimony of Dr. Freedom was properly excluded, we think, on the question of

mental capacity on the authority of *Grant v. Curtin,*
194 Md. 363, 384-385, 71 A. 2d 304, 313-314; *Berry
v. Safe Deposit & Trust Co.,* 96 Md. 45, 57-59, 53
A. 720, 724-726; and *Horner v. Buckingham,* 103
Md. 556, 64 A. 41. In reaching this conclusion we
are not unmindful of the statement in *Grant v. Curtin, supra,* that psychiatry has undoubtedly made great
strides since the days of the *Berry* case, but what was
said in *Horner v. Buckingham, supra,* at page 563,
still is pertinent: 'Evidence that the person has a disease which may or must eventuate in mental disease
cannot prove, or standing alone tend to prove, that
at a given point of time that he is actually so afflicted.
The tendency to mental infirmity, cannot *per se* prove
the infirmity, it must be shown by facts. If a person
has always shown through many years a high degree
of mental soundness, in fact through his entire life, a
jury ought not to be permitted to pronounce him insane, merely because a medical expert can be found
who will testify that he is affected with a disease that
may eventually produce insanity, without other facts
being shown that tend to prove that his speech or conduct is such as reasonably warrant the conclusion that
such point has actually been reached.' The difficulty
in the path of the *caveators* in the instant case, as in
*Horner v. Buckingham, supra,* is to show sufficient
manifestations of incapacity at the time of making the
will to lay the necessary foundation for the admission
of the testimony of an expert psychiatrist who admittedly never saw the testatrix."

In the case at bar, there was *no evidence* showing that the
testator on *December 30, 1959,* the day when the will was executed was not capable of executing a valid deed or contract and
the most the testimony considered by Dr. Guttmacher showed
was that *at times* the testator suffered from loss of memory,
failed to recognize relatives and others, and was, at times, in
the condition testified to by the lay witnesses and shown by the
medical reports. Then too, it is clear that the evaluation of a
testator's competence must be made upon *all* the available evi-

dence and Dr. Guttmacher had only considered a part of such evidence.

### (3) Mental Capacity

We now consider the question of whether the evidence, when viewed in the light most favorable to the caveators, was legally sufficient to be submitted to the jury on the issue of the testator's testamentary capacity on December 30, 1959.

As we recently said in *Ingalls v. Trustees, supra,* (a case involving the alleged lack of mental capacity of a testator over eighty years of age and suffering from arteriosclerosis) in considering the same question:

> "In considering the facts, all conflicts in the evidence must be resolved in favor of the caveators and the Court must assume the truth of the evidence produced on their behalf as well as all reasonable inferences in favor of the caveators that may be drawn from the evidence. *Tufts v. Poore,* 219 Md. 1, 8, 147 A. 2d 717, 721 (1959). See also *Smith v. Bernfeld,* 226 Md. 400, 405, 174 A. 2d 53, 55 (1961)." (244 Md. at 274, 223 A. 2d at 779).

The *whole* evidence is to be considered, and not merely that offered by the caveators. If there is a conflict in the testimony it is resolved in favor of the caveators, and they are entitled to all reasonable inferences in their favor from *all of the testimony.* See *Scheller v. Schindel,* 153 Md. 547, 551, 138 Atl. 415, 416 (1927). Uncontradicted evidence and unimpeached documentary evidence, however, cannot be ignored because it is unfavorable to the contention of the caveators.

We have already set forth in some detail the evidence produced on behalf of the caveators and many of the entries in the medical reports. The caveatee introduced important testimony and documents which must also be considered.

The two subscribing witnesses to the will testified that in their opinion the testator on December 30, 1959, when the will was executed, was of sound and disposing mind and capable of executing a valid deed or contract—the test set forth in Code (1957) Article 93, §349. These two officials of the Hancock Bank knew the testator well for a number of years. They "vis-

ited" with him for a while after the will had been executed. The testator invited Brooks to read the will, but Brooks declined to do this.

The testator's attending physician, Dr. Frank B. Thomas, III, testified that in his opinion the testator, on December 30, 1959, "was mentally capable of writing a will, knowing what was in it, knowing what property he owned, and was well oriented as to time, place and events." Dr. Thomas testified that the testator was becoming somewhat "senile" but indicated this was associated with "physical debility and not mental."

Dr. Philip M. Deatherage, who attended the testator as an orthopedic consultant at Berkeley Springs Hospital on December 4, 1959, testified that:

> "He seemed lucid and perfectly rational. If not, I would have sought to overrule his decision of refusal of being admitted and would have sought to overrule it either through relatives or through the Court. * * *
>
> "I felt that he was absolutely lucid and knew what he was doing from his conversation and he was known to be a very obstinate person and there was little use to argue with him."

The testimony of the clergy who ministered to the testator is also important. We have already indicated that at the suggestion of Bernard Little, the testator's nephew, Father Kerr, then pastor at St. Peter's Roman Catholic Church, the testator's parish church, indicated that the testator should make a will. More importantly, the testator received his communion regularly from Father Kerr and, as Father Kerr indicated, the Canon Law required that the communicant be lucid when he received the sacrament. Father Kerr testified that in April 1959, when he discussed the making of a will, the testator was "oriented as to time, place and events." It is obvious that Father Kerr considered the testator mentally capable of executing a will.

Father Quinn, who succeeded Father Kerr as pastor of St. Peter's Church, brought the sacrament to the testator regularly from December 1961 until the terminal illness in September 1964. Father Quinn testified that the testator understood what

was going on and as far as he could judge, the testator "appeared to be oriented as to time, place and to events" and was alert when he received Holy Communion.

An important witness for the caveatee was Thomas Little, the testator's older brother, with whom the testator lived after September 1959 and in whose home the will of December 30, 1959, was executed. He described his brother Edward, as a "recluse" and "sort of miserly." After the testator moved into Thomas' home, he was to pay $50 a month for his room and breakfast, but sought to get his brother Thomas to reduce the charge to $30 a month. Thomas testified: "I knew he had the money and could pay me the $50 a month, but don't you know he tried to bargain me for $30. I wasn't born yesterday nor the day before, I made him pay the $50." The testator issued monthly checks to Thomas in the testator's own handwriting. Thomas testified that his brother Edward enjoyed reading the *Sun* newspaper, the *Reader's Digest* and the *Saturday Evening Post* and that "he always looked at the stock market." He further testified that from the Fall of 1959 when Edward came to live with him until September 1964, Edward was mentally alert and they would have conversations about "the things of the day or whatever was going on." Thomas was not a caveator.

Lawrence Little, a nephew of the testator who also was not a caveator, and who is assistant cashier and branch manager of the Dual Highway Office of the First National Bank of Maryland, testified that in October 1960, he had a somewhat involved business transaction with his Uncle Ed involving an unintentional overpayment by Lawrence, as administrator of the estate of Thelma Gilleece, to her heirs at law because of the failure of one of the heirs to deposit a check given for a prior distribution. To rectify the error it was necessary for his Uncle Ed to refund $639.88 to the estate. His uncle understood the situation and on October 29, 1960, in his own handwriting gave a check for $639.88 to the Nicodemus National Bank. On this check there is the notation, "Refund for Error in the Estate of Thelma Gilleece." Lawrence also testified that he saw his Uncle Ed occasionally during 1958 and 1959, his uncle recognized him and he was no different when he saw him in those prior years than he was when he discussed the Gilleece transaction with Lawrence in 1960.

Beulah Fearnow, the proprietor of the Riverside Grocery Store, identified a series of checks dated 1962 to 1963 in the testator's handwriting, issued in payment for cigars and candy purchased by the testator in person from the store during the period mentioned.

Hazel Unger, a nurse's aid at the Hancock Nursing Home from March 1959 to September 1959 on the evening shift from 3 to 11 p.m. remembered that "Mr. Ed" would call her by name. She further testified that he would usually be reading and looking through magazines and that he also had newspapers in his room.

James Everett, who lived next door to the testator for more than sixty years, frequently visited the testator at his own home and when the testator lived at Thomas' home. Mr. Everett testified that the testator seemed to know what he was talking about, and that the testator seemed no different in September 1959 when he came to Thomas' house than he had been for several years before.

Edna Powers, a lifetime resident of Hancock who knew the testator—"a friend of my Daddy's"—talked to the testator when he left the nursing home and the testator said to her :

> "I am going back to Tommy's. Tommy and I are well taken care of. Tommy is the only one who cares for me, but I do have good help from my nephew and his wife."

She testified that he was no different on the occasion he told her this in the P. T. Little Store than he was for the last twenty or twenty-five years.

Chlorous Little, one of the residuary legatees, testified that she went to see the testator several times a day at the nursing home, did his laundry, carried food to him and generally attended to him. She voluntarily furnished him two meals a day after he moved to Thomas' house. She testified that he was not generous but was stingy.

Philip Little, a nephew of the testator and the remaining residuary legatee testified, as we have indicated, in regard to the preparation of the testator's will. Philip paid the fee of the attorney who prepared the will. He also testified that his uncle

did not discuss the will with him after he gave him the proposed draft and that he did not see the will again until a day or two after it was executed on December 30, 1959. He further testified to a conversation with the testator as to why the testator was not purchasing additional stocks, as follows:

"Well, he said the percentage he was paying the bank and what the yield of the stocks was, the stocks was so high and he said the yield wasn't much more than what the bank was, so why put it in high-priced stock. So that is why he put his money in the bank."

When asked whether the testator discussed his financial affairs with him, Philip testified:

"No, there was no discussion about it at all.

"Q. Did he ask your advice in connection with his investments? A. I couldn't give him any advice. He knew more than I did."

Philip testified that the testator at Thomas' house would read the stock market section of the *Sun* and would also read the *Saturday Evening Post* and the *Reader's Digest*. His uncle was also a regular subscriber to *Financial World*. His uncle also took long walks. Philip saw no difference in his Uncle Ed on December 30, 1959, than two or three years before.

The documentary evidence introduced by the caveatee is voluminous and impressive.

Sixteen checks dated from July 22, 1958, to August 15, 1959, in the handwriting of the testator and payable to "E. Bearinger" were introduced into evidence. Fourteen of these checks were for $125 and most of them have a notation on them such as "Pay to August 15, 1958," or "Service to November 15th" and the like. Two of the checks were for $5 and $4.85, respectively, the former marked "For pills," and the latter marked "Med."

In addition 169 checks, all in the handwriting of the testator, were introduced into evidence being dated between June 18, 1958, to December 2, 1963, in varying amounts from 38 cents to $7,146.25. A number of the checks were payable to

Thomas Little for the $50 monthly charge. Of special significance are the following checks:

June 18, 1958, to George G. Shriver & Co., Inc. for $5,385.38 with the notation "20 shrs. A. T. & T. Co. and 50 Shrs. Int. Harvester."

August 21, 1959, to Merrill, Lynch, Pierce, Fenner & Smith for $7,146.25 with the notation "100 Shrs. Ches. & Ohio Stk."

January 27, 1961, to Morgan Guaranty Trust Co. for $35.28 with the notation "balance on Stk. A. & P."

March 20, 1961 to American Telephone & Telegraph Co. for $1,290 with the notation "15 Shrs. A. T. & T. Stock."

November 28, 1961 to 1st Penn Pa. Banking for $120 with the notation "4 Shrs. Stock."

December 7, 1961 to the Irving Trust Co. for $40.61 with the notation "1 shr Stk."

There are six other checks dated between December 11, 1961, to October 17, 1963, from amounts of 38 cents to $1425 indicating stock purchases and all but one having notations to that effect.

Of importance because of their nearness in date to December 30, 1959, when the will was executed, are two checks, one dated December 17, 1959, to the "Was. Memorial Hospital" for $25 with the notation "12-4-59 X ray"; the other dated February 9, 1960, to "Hugh K. Troxell, Treasurer" for $58.57 with the notation "State & County Tax 1960."

On April 4, 1960, there were two checks given by the testator in payment of the 1959 balance of his Federal and State of Maryland income taxes, one to the District Director Internal Revenue for $4,111.96, the other to the "Comptroller of Treasury Md." for $732.81 and both marked "Taxes 1959."

In addition to these checks, there are deposit slips made out in the handwriting of the testator. Of particular importance are deposit slips all dated January 4, 1960. The first listed thirteen separate dividend checks in amounts from $1.50 to $109.20 and his Social Security check for $75. The testator correctly designated the name of each separate corporation, and the name "Social Security" for that check, and correctly added the column of figures making a total of $353.53. The second deposit slip, also dated January 4, 1960, contained five separate items, with

amounts from $2 to $160, the testator again designating the correct name of each corporation and reaching the correct total of $295.13. The third deposit slip, also dated January 4, 1960, contained four items, with the correct corporate names and a correct total of $386.33. Similar deposit slips dated in 1960 were introduced into evidence. Of special interest was one dated January 18, 1960, with eight items, correctly designating the corporations, but on which the testator originally had made an error in addition which he had crossed out and inserted the correct total.

Two documents, also entirely in the handwriting of the testator (which was quite legible) were also introduced into evidence. One was the resignation of the testator as a member of the Board of the Hancock Bank. This was dated December 19, 1958, and stated:

> "The Hancock Bank. I hereby resign as a member of the board of directors at the same time expressing my appreciation of many kindnesses shown me by said board and wishing the bank continued success. Edward A. Little"

The other document was dated June 6, 1961, and is as follows:

> "Brooks Smith Cashier. Dear Sir. Please let my nephew Philip Little have access to my private papers in your bank and he will bring them to me. Thank you very much. They are in envelope in your safe. If safe is locked tell him when he can get them. Edward A. Little."

A debit item addressed to the Hancock Bank in the handwriting of the testator was also put in evidence. It is dated December 9, 1960, bears the designation "Account Edward A. Little, transfer to Savings Account $5427.70" and has the following note at the bottom:

> "Brooks please leave 1000 on ck acct. and put balance on interest. Edward A. Little. I think that will make $50,000 on int. if that isn't right, please let me [know]."

It is significant that the savings account book shows this deposit of $5427.70 on December 9, at which time, giving effect to that deposit, the balance in the account was $51,295.51.

In rebuttal, the caveators offered the testimony of Frank Sachs that Brooks Smith in December 1958, had requested the witness to obtain the resignation of the testator as secretary to the board of directors of the bank and stated to him: "* * * at the last meeting, he sat at the table with his elbows on the table * * * his head in his hands and he didn't know what was going on around him, and he said he was incompetent." Brooks, however, on his cross-examination, when asked if he had told Frank Sachs that the testator was incompetent, testified that he "didn't recall using that word." This resignation occurred more than a year before the will was executed and as we have seen, the testator wrote out his resignation in his own handwriting. Brooks, as a subscribing witness to the will, testified, as we have indicated, that the testator in his opinion was of sound and disposing mind and mentally capable of executing a valid deed or contract *on December 30, 1959*.

At the most the whole evidence taken in the light most favorable to the caveators indicates a testator in his eighties who suffered from arteriosclerosis and who *at times* did not recognize certain relatives, went out in winter without warm clothing, shuffled, dozed off when people were talking to him, remembered things in the past better than current things and, at times, appeared to be in a stupor. As against this there is the uncontradicted—and uncontradictable—evidence of the testator's ability from 1958 to 1961 to handle his banking affairs, pay his bills, identify his corporate dividends, calculate correctly his deposit slips and exercise judgment in regard to stock purchases. His placing his money at interest rather than purchasing stocks from 1958 on is no evidence of mental derangement and, in any event, his policy in that regard was adequately explained by uncontradicted and reasonable evidence. In our opinion, the entire testimony, taken most favorably to the caveators does not present facts from which the jury could reasonably infer that the testator was not mentally capable of executing a valid deed, contract or will on December 30, 1959.

The caveators rely on *Lawson v. Ward,* 153 Md. 93, 137 Atl.

479 (1927), but, in our opinion, the decision in that case is clearly distinguishable on the facts from the case at bar. In *Lawson,* to quote from the opinion in that case:

> "The evidence however, pictures a man who not only failed to recognize acquaintances, but became lost several times on the streets of Crisfield, in surroundings familiar to him, permitted his living quarters and his clothing to become almost indescribably filthy, took clothes off to an indecent extent in public places, and once appeared outdoors wholly naked, spent nights singing aloud, was at times uncertain whether it was day or night, and picked up cast-off food from garbage cans and elsewhere, and ate it." (153 Md. at 100, 137 Atl. at 481).

We have quite a different situation in the case at bar.

### (4) Undue Influence

There was no evidence in the case sufficient to justify a submission of this issue to the jury. The testator had a strong will and there is no showing by evidence or inference that his will was overborne by either Philip or Chlorous, even if it be assumed, *arguendo,* that they—or either of them—stood in a confidential relation to the testator. The testator held the proposed will from April 1959 until December 30, 1959, before he executed it, saying that he might wish to make some changes. Even the account given by Bertha that the testator told her that Chlorous "was walking up and down until twelve at night trying to make him make a will" while he was in the nursing home, indicates that the alleged attempt was not successful and it is clear that the testator did not make any will at that time. In 1961 Chlorous needed $100 to buy some things for her eldest child who was going away to school. Thomas suggested that she ask her Uncle Ed to *loan* her the money. When she did this the testator replied "That is what the banks are for," and declined to loan her the $100—and this in spite of the care Chlorous had given the testator for several years without cost to him. There is even less evidence of any alleged undue influence in the case at bar than there was in *Ingalls v. Trustee, supra,* and in *Arbogast v. MacMillan, supra* where we held that the

372

trial court properly directed the verdict, or should have directed the verdict, for the caveatee on the issue of undue influence.

*Judgment affirmed; the costs to be paid by the appellants.*